Emily H. Hathorn et al., Respondents, *v.* Natural Carbonic Gas Company, Appellant.

**Waters and watercourses — mineral springs — power of legislature to regulate use thereof — constitutional law — constitutionality of statute (L. 1908, ch. 429).**

At common law a landowner may, by pumps or otherwise, draw on the waters percolating under the surface of his lands for a purpose naturally and legitimately connected with the improvement and enjoyment of his lands, even though it interferes with others, but an attempt by artificial means to force and increase the flow of such waters for the purpose of diverting them to some use entirely disconnected with such improvement and enjoyment, whereby the flow of such waters under the lands of others is destroyed or diminished, may be restrained as unreasonable and unlawful.

Independent of statutory prohibition a landowner has no right, by the use of pumps and other apparatus, greatly and unreasonably to accelerate and increase the natural flow of subterranean percolating mineral waters and gas through deep wells bored into a widely extended common supply of such substances, not for any purpose connected with the enjoyment of his lands, but for the purpose of procuring from the waters a supply of gas to be marketed throughout the country, and with the result of wasting great quantities of mineral waters and of destroying or impairing the natural flow of such waters and gas in and through the springs of other landowners throughout a large area, and of destroying or impairing the valuable character of such waters for the purposes for which they have been habitually used. *Acton* v. *Blundell*, 12 M. & W. 324, distinguished; *Forbell* v. *City of New York*, 164 N. Y. 522, 526, followed.

The prohibitions of the statute relating to Saratoga and other similar springs (L. 1908, ch. 429) are four in number. Two of these respectively forbid accelerating or increasing the flow of percolating waters or natural carbonic acid gas, such as are found at Saratoga Springs, from wells bored into the rock, by pumping or by any artificial contrivances whatsoever, *first*, absolutely and without qualifications; *second*, when the result of so doing will be to impair the natural flow or the quality of such waters or gas in the spring or well of another person. The fourth prohibition forbids the doing of any act whereby the flow or quality of the waters described or of the carbonic acid gas or other mineral ingredients therein in any spring or well is diminished, etc. *Held*, these prohibitions must be condemned as an unlawful interference with property rights and unconstitutional and inoperative because they forbid the performance of acts which a landowner may perform under certain limitations.

The statute further forbids accelerating or increasing the flow of perco-
lating waters or natural carbonic acid gas from wells bored into the
rock by pumping or any artificial contrivances whatever when the
object of so doing is to extract and collect the carbonic acid gas for the
purpose of marketing the same. *Held,* that it was proper for the legis-
lature to adopt this provision defining and regulating the rights of per-
sons desiring to use mineral waters like those at Saratoga Springs, and
calculated to prevent such use not connected with the enjoyment of the
land as would either result in waste of the natural resources of the land
to the injury of general and public interests or in the unreasonable
impairment of the rights of others entitled to draw from a common source.

The legislative power, from the peculiar nature of the right and the
objects upon which it is to be exerted, can be manifested for the pur-
pose of protecting all the collective owners by securing a just distribu-
tion to arise from the enjoyment by them of their privilege to reduce
to possession and reach a like end by preventing waste.

Under the admitted allegations of the complaint a proper basis existed
for the classification made by the legislature with respect to wells sunk
in the rocks as distinguished from shallower wells, and prohibiting the
pumping and forcing of water and gas to the surface through such
wells, and such provision is not a violation of the clause of the Federal
Constitution prohibiting any state from denying " to any person within
its jurisdiction the equal protection of the laws."

The legislature may authorize the People to maintain an action of this
character in the absence of restriction by the constitution, even though
it should be deemed to relate to private interests. In this case the Peo-
ple can maintain the action on the ground that the public interests are
thereby to be protected and in some substantial way promoted, and the
legislature may authorize any person, such as these plaintiffs, to main-
tain the action in their place and stead.

Where the allegations of the complaint make out a case for relief under
common-law principles, the fact that plaintiffs market the products of
their well by the sale of waters naturally flowing in their springs does
not fairly· or equitably forbid them from restraining appellant from
continuing by artificial means an increased and wasteful flow of waters
and gas for the purpose of marketing the latter.

While some of the affidavits presented in behalf of the appellant denied
and, therefore, raised an issue of fact with some of the allegations of
the complaint, such questions of fact were purely for the consideration
of the court granting the injunction. Resolving them in favor of the
respondents, as it was entitled to do and manifestly did do, the court
was fully authorized on the facts and within approved principles to
grant the injunction in question.

*Hathorn* v. *Natural Carbonic Gas Co.*, 128 App. Div. 33, affirmed.

(Argued November 24, 1908; decided February 23, 1909.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the third judicial department, entered September 25, 1908, which modified and affirmed as modified an order of Special Term granting a motion for a preliminary injunction *pendente lite.*

The action was brought by the respondents as owners of lands in the town of Saratoga Springs, New York, whereon were springs wherefrom naturally flowed waters holding in solution natural mineral salts and an excess of carbonic acid gas, to restrain appellant from accelerating and increasing by means of pumps and other apparatus the flow of similar water and gas from their deep wells in said town, and whereby, as claimed, the flow from the springs of the respondents and others was destroyed or diminished.

A preliminary injunction was granted by the Special Term restraining appellant from performing the acts complained of, and this order, after a modification not substantially affecting its results, was affirmed by the Appellate Division.

The appellant demurred to the complaint, and under these circumstances the Appellate Division granted leave to appeal and certified to us the following questions :

1st. Is chapter 429 of the Laws of 1908 a constitutional enactment ?

2nd. Does the complaint state a cause of action under the statute of 1908, chapter 429 ?

3rd. Does the complaint state a cause of action other than that under the statute hereinafter mentioned ?

4th. Did the Supreme Court have power to grant the preliminary injunction ?

The complaint which is involved in these questions contains but one count, and is claimed by its framers to set forth a cause of action both at common law and under the statute referred to. The substance of the material allegations purporting to set forth a cause of action at common law is as follows :

Aside from formal matters, they assert the ownership by plaintiffs of certain premises in the village of Saratoga Springs,

on which for about forty years there has been a spring of mineral water, holding in solution natural mineral salts and an excess of carbonic acid possessing great medicinal virtue and of high value, and that during all this time and until the commission by the defendant of the alleged wrongful acts complained of, said spring naturally and freely flowed to the surface in a continuous stream; that plaintiffs during many years have been engaged in bottling and marketing the products of said spring, incurring great expense therein and deriving great profit therefrom; that said carbonic acid gas is for various specified reasons a necessary and valuable element in said waters; that prior to the commencement of this action the defendant, being the owner of a tract of land situate in said village nearly a mile distant from plaintiffs' premises, drilled thereon several deep wells into the rock beneath the surface of its lands, and by means of "powerful pumps, suctions and other artificial contrivances," accelerated and increased the flow from said wells of mineral waters and carbonic acid gas similar to those produced at plaintiffs' spring, whereby they were enabled to and did draw and secure an unreasonable amount of water and gas; that in each case such waters and gas were drawn from a supply percolating through the rocks under the surface of the land, and that the waters and gas thus percolating under the respective tracts of the parties to this suit as well as through a large additional area where other springs were located were part of a single system and constituted one common source of supply for all the wells and springs; that the effect of defendant's acts in accelerating and forcing the flow of water and gas from its wells by such artificial means has been to seriously affect and decrease the flow of water and gas at the springs of plaintiffs and of other people throughout the town and to depreciate the character and quality of the water produced thereat; that defendant has not utilized the water and gas thus drawn by it from its wells in connection with or in increasing the enjoyment of its land or for any purpose connected therewith, but has extracted from the water the car-

bonic acid gas which it has marketed generally throughout the country, turning the water containing the other minerals in great quantities to waste; that by reason of these various acts the plaintiffs have been greatly damaged.

In addition to these allegations there are various others which in connection with them are claimed to set forth a cause of action under chapter 429 of the Laws of 1908. This act is entitled "An act for the protection of the natural mineral springs of the state and to prevent waste and impairment of its natural mineral waters." It contains in substance the following prohibitions:

1. Against pumping or by any artificial contrivance whatsoever in any manner accelerating the natural flow, or producing an unnatural flow of that class of mineral waters holding in solution natural mineral salts and an excess of carbonic acid gas from any well made by boring or drilling into the rock, or by any artificial contrivance whatsoever in any manner accelerating the natural flow or producing an unnatural flow, of natural carbonic acid gas issuing from or contained in any well made by boring or drilling into the rock.

2. Against performing the acts enumerated in the foregoing provision when the effect will be to diminish, retard, impair, etc., · "the natural flow from any mineral spring or any mineral well belonging to any other person or corporation," or " the quality of its waters * * * or the quantity of its carbonic acid gas or mineral ingredients."

3. Against performing the acts enumerated in the first provision for the purpose of extracting, collecting, compressing, liquefying or vending the carbonic acid gas as a commodity otherwise than in connection with the mineral water.

4. Against "the doing of any act or thing whatsoever whereby the natural flow from any spring or well" of the character described is diminished, retarded, etc.

Said act further provides that any citizen of the state may maintain an action to restrain any person or corporation from committing any of the prohibited acts in any city or town in which said citizen is a taxpayer, etc.

The substantial allegations, in addition to those already summarized, by which the plaintiffs seek to make out a cause of action under this statute, allege, in substance, their qualifications as taxpayers; a violation in terms by defendant of each of the prohibitions of the statute above quoted; that there is a special pressure of gas in the rock strata into which defendant's wells are bored, causing water and gas to flow to the surface, which is not exerted in the soil above the rocks, and that the withdrawal of gas from such strata tends to destroy the flow of the springs and impair the quality of the water; that in consequence of the mineral springs of plaintiffs and other persons in said town a large amount of money has been invested in Saratoga Springs in the way of hotels and boarding houses, hospitals and sanitariums for the accommodation of visitors seeking health from the use of said mineral waters, and employment has been given to a large number of people; that the people at large are interested in the maintenance and preservation of such springs; that by the unlawful acts of the defendant the flow of plaintiffs' spring and that of other springs throughout the town has been injuriously affected and the quality and value of the waters flowing therefrom impaired and a large amount of water wasted; that by reason of these facts many persons have been injured and will continue to be injured unless said unlawful acts are stopped.

*Alton B. Parker* for appellant. The complaint does not state facts sufficient to constitute a cause of action. (*Merrick* v. *City of Brooklyn*, 18 App. Div. 340; 160 N. Y. 657; *Huber* v. *Merkel*, 117 Wis. 355; *Roath* v. *Driscoll*, 20 Conn. 533; *Brown* v. *Illins*, 27 Conn. 34; *Greenleaf* v. *Francis*, 18 Pick. 117; *Davis* v. *Spalding*, 157 Mass. 431; *Fraser* v. *Brown*, 12 Ohio St. 294; *Haldemann* v. *Bruckhard*, 45 Penn. St. 514; *Whatley* v. *Bough*, 25 Penn. St. 528; *O. G. Assn.* v. *Asbury Park Com.*, 40 N. J. Eq. 447; *S. P. R. R. Co.* v. *Dufour*, 95 Cal. 615.) Chapter 429 of the Laws of 1905 is unconstitutional. (*B C. M. Co.* v. *M. O. Co.*, 63 Pac. Rep. 825; Cooley's Const. Lim. [7th ed.] 507; *Munn* v.

*Illinois,* 94 U. S. 145 ; *Westervelt* v. *Gregg,* 12 N. Y. 202 ;
*Foster* v. *Scott,* 136 N. Y. 577 ; *Wright* v. *Hart,* 82 N. Y.
330 ; *Muster* v. *Kansas,* 123 U. S. 623 ; *Lawton* v. *Steele,*
152 U. S. 133 ; *Fisher Co.* v. *Wood,* 187 N. Y. 90 ; *People*
v. *New York,* 109 N. Y. 389 ; *Huber* v. *Merkel,* 117 Wis.
355.)

*Edgar T. Brackett* for intervening parties.   The complaint
does not state a cause of action at common law.   Aside from
the provisions of the statute, no actionable injury is alleged.
(*Bloodgood* v. *Ayres,* 108 N. Y. 400 ; Gould on Waters, 555,
§ 280 ; Angell on Watercourses [7th ed.], 162, § 114a ; *Pix-
ley* v. *Clark,* 35 N. Y. 520 ; *Acton* v. *Blundell,* 12 M. & W.
324 ; *Delhi* v. *Youmans,* 50 Barb. 316 ; *Bliss* v. *Greeley,* 45
N. Y. 671 ; *Johnstown* v. *Veghte,* 69 N. Y. 16 ; *Van Wycklen*
v. *Brooklyn,* 118 N. Y. 424 ; *Phelps* v. *Nowlen,* 72 N. Y.
39 ; *Barkley* v. *Wilcox,* 86 N. Y. 140 ; *Greenleaf* v. *Francis,*
18 Pick. 117.)   Chapter 429 of the Laws of 1908 is unconsti-
tutional and void.   (*Forster* v. *Scott,* 136 N. Y. 577 ; *Matter of
Jacobs,* 98 N. Y. 98 ; *People* v. *Otis,* 90 N. Y. 48 ; *Wynehamer*
v. *People,* 13 N. Y. 378 ; *Matter of N. F. Ry. Co.,* 108 N. Y.
375 ; *Matter of S. R. C. R. Co.,* 128 N. Y. 408 ; *Matter of
D. C. Assn.,* 66 N. Y. 569 ; *Matter of Burns,* 155 N. Y. 23 ;
*Varner* v. *Martin,* 21 W. Va. 534 ; *Matter of Albany Street,*
11 Wend. 148.)   The act may not be defended as an exercise
of the police power.   (*Forster* v. *Scott,* 136 N. Y. 584 ; *Colon*
v. *Lisk,* 153 N. Y. 188 ; *Wright* v. *Hart,* 182 N. Y. 330 ;
*Lawton* v. *Steele,* 152 U. S. 133 ; *People* v. *Gillson,* 109
N. Y. 389 ; *Matter of Jacobs,* 98 N. Y. 98 ; *Comm.* v. *Alger,*
7 Cush. 53 ; *Coe* v. *Schultz,* 47 Barb. 64 ; *People* v. *Zimmer-
man,* 102 App. Div. 103 ; *Marburg* v. *Madison,* 1 Cranch,
137.)   The fourth question certified, " Did the Supreme
Court have power to grant the preliminary injunction ? "
should be answered in the negative.   (*Farrow* v. *H. T. Co.,*
74 Hun, 585 ; *Unckles* v. *Colgate,* 148 N. Y. 529 ; 1 Pom.
Eq. Juris. §§ 397, 398 ; *York* v. *Searles,* 97 App. Div. 331 ;
*Johns* v. *Norris,* 22 N. J. Eq. 102 ; *Wilson* v. *Bird,* 28

N. J. Eq. 352; *Bachman* v. *Harrington*, 184 N. Y. 458; *Bronk* v. *Riley*, 50 Hun, 489; *N. Y. & A. R. R. Co.* v. *N. Y., W. S. & B. R. R. Co.*, 11 Abb. [N. C.] 386; *Bruce* v. *D. & H. C. Co.*, 19 Barb. 371; *McCafferty* v. *Glazier*, 10 How. Pr. 475.)

*Nash Rockwood, Charles C. Lester* and *J. Newton Fiero* for respondents. The pumping of its wells by defendant is a wrong which the courts would enjoin at the suit of an injured party. (*Hathorn* v. *Strong's Sanitarium*, 55 Misc. Rep. 455.) Chapter 429 of the Laws of 1908 is a valid and proper legislative enactment. (*Smith* v. *City of Brooklyn*, 18 App. Div. 340; 160 N. Y. 357; *Forbell* v. *City of New York*, 47 App. Div. 371; 164 N. Y. 522; *Hathorn* v. *Strong's Sanitarium*, 55 Misc. Rep. 445; *F. L. S. Co.* v. *Howard*, 163 Ind. 687; *Katz* v. *Walkenshaw*, 64 L. R. A. 236; *R. N. G. Co.* v. *E. N. G. Co.*, 31 Ind. App. 222; *O. O. Co.* v. *Indiana*, 177 U. S. 190; *Westphal* v. *City of New York*, 75 App. Div. 252; 177 N. Y. 140; *State* v. *O. O. W. Co.*, 150 Ind. 21.) The use the defendant is making of the mineral water it pumps is outside the scope of its rights. (*Forbell* v. *City of New York*, 164 N. Y. 522; *Smith* v. *City of Brooklyn*, 18 App. Div. 340; *M. W. Co.* v. *City of Brooklyn*, 32 App. Div. 454.) The act does not violate section 1 of the 14th amendment to the Federal Constitution in denying to persons the equal protection of the laws. (*Barbier* v. *Connolly*, 113 U. S. 27; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Dent* v. *West Virginia*, 129 U. S. 114; *Jonas* v. *Brim*, 165 U. S. 184; *Minn* v. *Beckwith*, 129 U. S. 29; *Soon Hing* v. *Crowley*, 113 U. S. 705; *Louisiana* v. *Schemmler*, 42 La. Ann. 1166; *City of Des Moines* v. *Keller*, 116 Iowa, 648; *Sutton* v. *State*, 96 Tenn. 696; *People* v. *Havnor*, 149 N. Y. 195.) The act is a valid exercise of the police power vested in the legislature of the state of New York. Its purpose and effect are to prevent the waste and destruction of the natural resources of the state. (Cooley's Const. Lim. 572; *Comm.* v. *Alger*, 7 Cush. 85; *Meffert* v. *Parker*, 66 Kan. 710; *People*

v. *King*, 110 N. Y. 418; *Barbier* v. *Connolly*, 113 U. S. 31;
*C., C. & Q. Ry. Co.* v. *Drainage Comrs.*, 200 U. S. 592;
*Thorpe* v. *R. R. R. Co.*, 27 Vt. 140; *Bacon* v. *Walker*, 204
U. S. 312; *H. W. Co.* v. *McCarter*, 209 U. S. 349; *Kansas*
v. *Colorado*, 185 U. S. 141; 206 U. S. 46; *Georgia* v. *Tenn.
Copper Co.*, 206 U. S. 230–238.) The complaint states a
cause of action and is sufficient in all things. (*People* v.
*Ballard*, 134 N. Y. 269; *H. W. Co.* v. *McCarter*, 209 U. S.
349; *Kansas* v. *Colorado*, 185 U. S. 141; 206 U. S. 46;
*Georgia* v. *Tenn. C. Co.*, 206 U. S. 230.)

HISCOCK, J. The object of this action is to restrain the
appellant from using pumps and other apparatus for the pur-
pose of accelerating and increasing the flow of subterranean
percolating waters and gas through deep wells which it has
sunk upon its premises in the town of Saratoga Springs.

The respondents insist that their complaint, which has been
summarized in the foregoing statement, sets forth a cause of
action both at common law and under the provisions of the
statute entitled "An act for the protection of the natural
mineral springs of the State and to prevent waste and impair-
ment of its natural mineral waters," being chapter 429 of
the Laws of 1908. The appellant, on the other hand, by
demurrer, challenges it as not setting forth a cause of action
on either theory.

I shall endeavor first to apply to the pleading thus attacked
the test of common law principles, and the question whether
measured by them it does set forth a cause of action may be
stated in a more concrete form applicable to the specific facts
involved in this action. Thus stated, it will be whether a
landowner has the right by the use of pumps and other
apparatus greatly to accelerate and increase the natural flow
of subterranean percolating mineral waters and gas through
deep wells bored into a widely extended common supply of
such substances, not for any purpose connected with the
enjoyment of his lands, but for the purpose of procuring from
the waters a supply of gas to be marketed throughout the

country, and with the result of wasting great quantities of mineral waters and of destroying or impairing the natural flow of such waters and gas in and through the springs of other landowners throughout a large area, and of destroying or impairing the valuable character of such waters for the purposes for which they have been habitually used.

The earlier decisions in this and other states laid down the general rule that a landowner might not be enjoined from doing an act on his own premises which resulted in diverting or even wholly destroying the flow of percolating waters from or upon his neighbor's lands. (*Ellis* v. *Duncan*, 21 Barb. 230; *Pixley* v. *Clark*, 35 N. Y. 520; *Trustees of Village of Delhi* v. *Youmans*, 45 N. Y. 362; *Bloodgood* v. *Ayres*, 108 N. Y. 400; *Haldeman* v. *Bruckhart*, 45 Pa. St. 514; *Greenleaf* v. *Francis*, 18 Pick. 117; *Frazier* v. *Brown*, 12 Ohio St. 294.)

In thus holding they but followed the rule laid down in the leading case of *Acton* v. *Blundell* (12 M. & W. 324, 354), wherein was approved the principle " which gives to the owner of the soil all that lies beneath his surface; * * * that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria*, which cannot become the ground of an action."

It will hardly be profitable to consider all of the different reasons which led the courts to adopt these principles, but it is important to bear in mind that they were invariably applying them to cases in each of which the party complained of had interfered with the enjoyment by another of percolating waters by some act which was directly and naturally connected with the improvement or enjoyment of his own land. Thus in the *Acton* case, the act which resulted in the interference complained of consisted in mining operations on a man's own land. In the case of *Ellis* v. *Duncan* the person intercepting

the flow of percolating waters on his neighbor's land had done so by digging a trench or ditch and opening a quarry on his premises. No question was presented in these cases of a landowner depleting or exhausting a common supply of underground waters by artificial methods for purposes not in any way connected with the enjoyment or use of his own lands.

But with the increased demands upon natural resources such as water this question did begin to arise. It seems to have been first suggested in England in the case of *Chasemore* v. *Richards* (7 H. L. Cas. 349). There the question arose whether the flow of percolating waters on another's land might be diverted or destroyed by pumping for purposes of supplying a municipality with water, and while it was finally held that this might be done it was only after the right had been seriously questioned.

In this state it was first discussed though not actually involved in *Smith* v. *City of Brooklyn* (18 App. Div. 340), and it was there stated by Judge HATCH that the right in this state had never " been upheld in the owner of land to destroy a stream, a spring or well upon his neighbor's land, by cutting off the source of its supply, except it was done in the exercise of a legal right to improve the land or make some use of the same in connection with the enjoyment of the land itself, for purposes of domestic use, agriculture or mining or by structures for business carried on upon the premises."

Finally, in the case of *Forbell* v. *City of New York* (164 N. Y. 522, 526) the question reached this court and the necessity was recognized, not for an alteration of the rules which had been applied by earlier cases to the facts then presented, but rather for an enlargement and extension of such rules so that they would be applicable to new conditions. That case for the first time in this state at least laid down the rule of the reasonable use of percolating waters which I think is applicable to and controlling of the facts in this case. There the city of New York tapped waters percolating under some lands purchased by it and which were part of a connected

system or supply extending over a large area, and then by powerful apparatus so forced the flow of this water as to exhaust the supply which had formerly supplied plaintiff's land, and this was done for the purpose of furnishing a supply of water for the defendant. The court, reviewing many earlier cases passing upon the right of a landowner to enjoy the sub-surface waters under his premises, said : " In the cases in which the lawfulness of interference with percolating waters has been upheld, either the reasonableness of the acts resulting in the interference, or the unreasonableness of imposing an unnecessary restriction upon the owner's dominion of his own land, has been recognized.

" In the absence of contract or enactment, whatever it is reasonable for the owner to do with his sub-surface water, regard being had to the definite rights of others, he may do. He may make the most of it that he reasonably can. · It is not unreasonable, so far as it is now apparent to us, that he should dig wells and take therefrom all the water that he needs in order to the fullest enjoyment and usefulness of his land as land, either for purposes of pleasure, abode, productiveness of soil, trade, manufacture, or for whatever else the land as land may serve. He may consume it, but must not discharge it to the injury of others. But to fit it up with wells and pumps of such pervasive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff and the others whose lands are thus clandestinely sapped, and their value impaired." The principles thus adopted in the *Forbell* case have been fairly upheld in the courts of other states. (*Gagnon* v. *French Lick Springs Hotel Co.*, 163 Ind. 687 ; *Richmond Nat. Gas Co.* v. *Enterprise Nat. Gas Co.*, 31 Ind. App. 222 ; *Willis* v. *City of Perry*, 92 Iowa, 297 ; *Katz* v. *Walkinshaw*, 141 Cal. 116.)

The situation described by the complaint in this action is

relatively of the same general character as that with which the court dealt in the case cited.

One proprietor by artificial and unusual methods has so increased the flow of percolating waters and gas upon its lands that it is obtaining a greatly increased proportion of a common supply at the expense of its neighbors, and it is doing this in order to supply a public market for a portion of these products while the others are wasted. The only important feature distinguishing the cases is the element of waste present in this one and absent in the earlier one.

If these facts, resting now merely on the allegations of a pleading, shall be established by evidence, the trial court will in my opinion be fully authorized to draw the conclusion that they disclose a case of unreasonable and improper conduct by the appellant in the premises, and make out in favor of respondents a sufficient cause for appeal to and relief by a court of equity.

It has been suggested that the Saratoga waters are of a peculiar character and more in the nature of minerals than waters and that, therefore, the use of them by the landowner should be governed by different rules than those which ordinarily apply to the use of subterranean waters. It may be answered to this suggestion that subterranean waters have always been treated as a mineral in the decisions relating to their use and enjoyment and that no distinction in this case can be predicated upon the peculiar character and quantity of the salts and gases which happen to be in solution. (*Westmoreland N. Gas Co.* v. *De Witt,* 130 Pa. St. 235, 249; *People's Gas Co.* v. *Tyner,* 131 Ind. 277, 280.)

The case of *Huber* v. *Merkel* (117 Wis. 355) has been pressed on our attention by the appellant both as sustaining its right at common law to draw water and gas as it has been doing and also as denying the right of the legislature to pass the statute next to be considered. In that case the court was construing the constitutionality of a law providing in substance that any owner or operator of an artesian well who permitted it to discharge more water than was reasonably necessary for

his use, thereby materially diminishing the flow of water in any other artesian well in the same vicinity, should be liable for damages. In the course of its consideration of this law it was stated : " So it seems inevitable that, in this state at least, the right of a landowner to sink wells and gather and use percolating waters as he will, * * * is a property right, which cannot be taken away from him or impaired by legislation, unless by way of the exercise of the right of eminent domain, or by the police power," and it was then held that the statute was not a proper exercise of police power and was unconstitutional. It is to be said of this case as greatly distinguishing it from the present one that it was dealing with the natural flow of percolating waters and not with a flow unnaturally forced by artificial means. If, however, some of the broad statements made in the opinion should be deemed pertinent to such facts as are disclosed here and to sustain the right of a proprietor to use at will subterranean waters under the circumstances disclosed in this case, it must be said, as was intimated in the Wisconsin case itself, that the courts of this state and of that one disagree on this subject.

It also is especially urged that respondents have been forcing the flow of water through their springs and marketing the same, and that, therefore, under the doctrine of *Merrick Water Co.* v. *City of Brooklyn* (32 App. Div. 454 ; affd., 160 N. Y. 657) relief should be denied to them. It is a sufficient answer to the first branch of this contention to say that we are now measuring respondents' rights by the allegations of their complaint and that such allegations are to the effect that before the acts complained of they were enjoying a natural flow of waters through their springs to the surface of the ground and that it is this which has been interfered with. So far as the second branch is concerned, if they were seeking to restrain the mere marketing of the products of appellant's well, it might be a sufficient answer to say that they were doing the same thing, but I fail to see how the sale of waters naturally flowing in their springs fairly or equitably forbids them from restraining appellant from continuing by artificial means the

increased and wasteful flow of waters and gas, which is the thing complained of.

In conclusion on this branch of the case it may be added that we have not been concerned with the inquiry whether the pleader originally intended to set forth a cause of action at common law or whether if he did he has burdened his statement thereof with many superfluous and inapplicable allegations. The sole question presented to us is whether between the beginning and end of the complaint there may be found those allegations which, taken together, make out a case for relief under common-law principles, and that question as already indicated should in my opinion be answered in the affirmative.

We are next led to a consideration of the question whether respondents' complaint sets forth a cause of action under the statute which has been referred to. Independent of the query whether the respondents as taxpayers have an interest which even under the authorization of the statute will enable them to maintain this action and which will be considered by itself, this question also largely resolves itself into a second one, and that is whether the statute is constitutional. If it be so aside from the special question suggested, it is not, as I understand it, seriously contended that the complaint does not state a cause of action. In brief and in addition to various facts already commented on, it alleges the situation of respondents as persons authorized by the statute to bring the action; the violation of each and all of the prohibitions of the statute, resulting waste of great quantities of mineral waters and impairment both of the quantity and quality of the supply of water formerly flowing in the wells of respondents and other persons throughout the Saratoga area and substantial and extensive injury present and future to property owners in that community and to the public.

The underlying contention of the appellant with respect to this branch of the case is that the prohibitions of the statute are unconstitutional, *first*, because they unlawfully deprive it and others of the use and enjoyment of their property, and,

*second*, because being applicable only to wells driven into the rock they create unlawful distinctions and disregard that equality of rights which should prevail amongst citizens and property owners. I shall consider these objections in the order stated.

As already stated, these prohibitions are four in number, and in effect they respectively forbid accelerating or increasing the flow of percolating waters or natural carbonic acid gas, such as are found at Saratoga Springs from wells bored into the rock by pumping or any artificial contrivances whatsoever; *first*, absolutely and without qualifications; *second*, when the result of so doing will be to impair the natural flow or the quality of such waters or gas in the spring or well of another person; *third*, when the object of so doing is to extract and collect the carbonic acid gas for the purpose of marketing the same, and, *fourth*, prohibit the doing of any act whereby the flow or quality of the waters described or of the carbonic acid gas or other mineral ingredients therein in any spring or well is diminished, etc.

It was substantially admitted by the respondents that the last prohibition was so broad and unqualified as to be unconstitutional and inoperative, and that, therefore, may be eliminated from our consideration.

The constitutionality of the other provisions must substantially be tested by reference to the rights of a landowner in underlying percolating waters independent of this statute. Those rights have already been discussed, and if proper conclusions have been reached, we have it that such a landowner may by pumps or otherwise draw on the waters percolating under the surface of his lands for a purpose naturally and legitimately connected with the improvement and enjoyment of his lands, even though it interferes with others, but that an unreasonable attempt to force and increase the flow of such waters for the purpose of diverting them to some use entirely disconnected with such improvement and enjoyment, and whereby the flow of such waters under the lands of others is destroyed or diminished, may be restrained as unlawful.

When these rules are applied it seems to me that the first two prohibitions of the statute must be condemned and the third one upheld. ·

The former not only prohibit pumping waters and gas described where the result will be to interfere with the spring of another person, but forbid such acts absolutely, even though they interfere with nobody. Their application is not limited to waste or commercial uses, but under them as they are plainly and explicitly written, a landowner in any part of the state is prohibited from extracting by means of the simplest and most modest contrivance waters from a well bored on his premises for the most legitimate and natural purpose connected with the use of his premises, provided the well happens to strike rock, and provided the water contains mineral salts and carbonic acid gas, and this whether such act interferes or not in an infinitesi‐ mal degree with the supply of some other person. It seems to me that this is such a clearly unlawful interference with well-established property rights already discussed that amplification of the idea is unnecessary.

Of course the principle is not overlooked that the presumption is in favor of the legislative act, although it must be admitted that this presumption is somewhat weakened at this point by the common concession that at least one unconstitutional prohibition has been incorporated into this statute. Nevertheless, applying this presumption to these provisions, and utilizing every reasonable rule of construction in further‐ ance of the presumption, I am unable to reach a conclusion favorable to them. It will not do to say that they simply contemplate and have reference to the particular conditions prevailing at Saratoga Springs and do not mean what they seem to, for the statute is general and applies throughout the state, But, even if we accept this view of legislative intent, there must be a limit to those processes of interpretation by which definite expressions may be squared with assumed purposes, and in my judgment this limit must be transgressed if we uphold what has been written here.

We are bound to consider what may be, as well as what is

presently being effected under a statute. (*Stuart* v. *Palmer*, 74 N. Y. 183.)

The present one at best and under a reasonable construction may at times accomplish unexpected results, and it does not seem best at the outset to attempt to cure plain defects in it by amendments which are more properly a subject for legislative enactment than for creation by judicial interpretation.

The principles which lead to the condemnation of the two provisions just discussed lead to the approval of the third provision as constitutional and proper. As we have seen, the landowner has no vested right unnaturally and unreasonably to force the flow of percolating waters for the purpose of marketing them, or for any purpose not connected with the use or enjoyment of his land. This being so, it was entirely proper for the legislature to adopt the provision in question defining and regulating the rights of persons desiring to use mineral waters like those at Saratoga Springs and calculated to prevent such use thereof as would either result in waste of the natural resources of the land to the injury of general and public interests, or in the unreasonable impairment of the rights of others entitled to draw from a common source. The allegations of the complaint establish that both of these injurious results have flowed from the use which appellant is making of its wells. But of course the right of the legislature to adopt such a provision as is now being questioned was not limited to a case of present demonstrated injuries from the acts prohibited. It had the power of discretionary and anticipatory legislation extending over a broad field, and the right within its limits to regulate such conduct of its citizens as being inherently of a more or less indeterminate character might still result in injury to the public.

With the light thrown by the allegations of the complaint on the matter to which this provision relates, I should have no doubt that the latter was within the powers of the legislature, even if it was a new step in the realm of police or regulative legislation. But it is not of a new order and for the purpose of maintaining this proposition I shall not

discuss a great variety of legislative enactments held valid which by analogy seem to sustain this one, but shall come immediately to authorities which directly sustain the present exercise of legislative power.

In Cooley on Constitutional Limitations (7th ed), 829, it is said : " The police power of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offences against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others."

This doctrine was quoted with approval in *People ex rel. N. Y. El. Lines Co.* v. *Squire* (107 N. Y. 593, 605).

In *Commonwealth* v. *Alger* (7 Cush. 85) it is said : " Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient."

In *Townsend* v. *State* (147 Ind. 624) there was subject to consideration a statute forbidding " the use of natural gas for illuminating purposes in what are known as flambeau lights," as a wasteful and extravagant use thereof and dangerous to the public good. The constitutionality of the statute was upheld, and it was said : " While our republican government guarantees the right to pursue one's own happiness, yet that government is charged with the duty of protecting others than appellant in the pursuit of their happiness, and hence the inalienable right to pursue one's own happiness must necessarily be subject to the same right in all others. Hence, when that right is asserted in such a manner as to conflict with equal right to the same thing in others it is not an inalienable right nor a right at all, but is a wrong."

In *Ohio Oil Co.* v. *Indiana* (177 U. S. 190, 209) it was held that a statute making it unlawful for any person owning or controlling a gas or oil well to permit the flow of gas or oil from such well except under certain restrictions tending to prevent waste and depletion of the general supply was constitutional. Many things were said by Justice White in the discussion of that case which are applicable to the present one, but I shall only quote a single paragraph. After reviewing the many cases he says : " On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a co-equal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence, it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their privilege to reduce to possession, and to reach the like end by preventing waste."

Each of the provisions which have been discussed is so complete and independent of the others that there is no difficulty in upholding the statute in respect to one although we condemn the others.

The second constitutional objection to the statute is that it violates the provision of the Federal Constitution prohibiting any state from denying " to any person within its jurisdiction the equal protection of the laws." This contention is based

on the fact that the provisions of the statute affect only wells bored or drilled into the rocks. It is not and, of course, cannot be urged that these provisions do not affect equally all wells of a certain general description. The statute simply makes a classification of wells and it is conceded that this may be done, if such classification is based on some sufficient reason and not on mere caprice or arbitrary election. The rule on this subject, cited with approval by appellant itself, is laid down in *Gulf, Col. & S. F. Railway* v. *Ellis* (165 U. S. 150, 155). Justice BREWER there says: " But it is said that it is not within the scope of the Fourteenth Amendment to withhold from states the power of classification, and that if the law deals alike with all of a certain class it is not obnoxious to the charge of a denial of equal protection. While, as a general proposition, this is undeniably true * * * yet it is equally true that such classification cannot be made arbitrarily. * * * These (citing certain illustrations) are distinctions which do not furnish any proper basis for the attempted classification. That must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis."

Under the admitted allegations of the complaint it seems to me clear that a proper basis existed for the classification made by the legislature with respect to wells sunk in the rocks and prohibiting the pumping and forcing of water and gas to the surface through such wells. In the fifteenth and sixteenth paragraphs of the complaint are allegations that the excess of carbonic acid gas existing in and filling the cavities of the rocks underlying Saratoga Springs, by reason of its confinement therein, exerts a great pressure, which tends to expel the waters and gas from the cavities of said rocks and cause them naturally to flow to the surface, and that when the gas escapes from the rocks into the superincumbent soil its power to exert such pressure is gone and it ceases to possess any efficiency as an agent to effect the flow of said mineral water; that the mineral springs in said town are dependent

for their existence upon the pressure of carbonic acid gas confined in said rocks and the withdrawal of the gas from the latter tends to destroy the force which brings the water into the natural springs and to destroy the conditions upon which the existence of said springs depend.

It thus appears that the conditions prevailing in the wells bored into the rocks are very different from those prevailing in wells sunk into the dirt; that there is less need for pumping in the former than in the latter, and, conversely, that pumping in the former will be much more exhaustive and destructive of common rights than if applied to the shallower wells. The legislature was entitled to anticipate that the same conditions which apply to Saratoga Springs might be applicable to other wells tapping precisely similar springs in other parts of the state, and within the broad discretion conferred upon it to prevent not only existing but anticipated evils, it clearly was justified in making the distinction between different wells which it did make and the classification complained of. It may be suggested that it would have been legal and much safer to pass a special act dealing with known conditions at Saratoga Springs rather than a general act which may include unexpected situations elsewhere in the state. This was a question of policy to be settled by the legislature which may still prevent or cure any undesirable results by appropriate amendment of the present law.

I come next to that contention of the appellant which lies rather outside of the act itself and which is that the respondents as taxpayers have no such interest or standing as entitles them to maintain an action under it. They concededly are of the description of persons expressly authorized by the statute to maintain such an action, and I do not understand it to be questioned but that if the People themselves might maintain this action, they may authorize any person such as the respondents to maintain it in their place and stead. Therefore, the question becomes whether the People have a sufficient interest in these matters so that they might maintain an action to enforce observance of the statute which the legislature representing

them has passed.   It seems to me that their right so to do must be affirmed on two grounds.

In the first place I understand it to have been held in *People* v. *Ballard* (134 N. Y. 269, 291) that the legislature by express provision may effectively authorize the People or a person in their stead to maintain an action like this in the absence of some restriction in the Constitution, even though the action should be deemed to relate to private interests. That action was brought by the attorney-general in the name of the People against a domestic business corporation and its trustees to remove the latter from their position for misconduct and compel them to account for and pay over to the corporation the value of property belonging to it, by them unlawfully transferred.   One of the questions involved and discussed was whether the attorney-general was authorized to bring the action in the name of the People in his discretion, and this question involved a construction of certain provisions of the Code of Civil Procedure for the purpose of determining whether they did expressly authorize such action.   Judge VANN, writing the majority opinion, concluded : " That the legislature intended to authorize the attorney-general to bring such an action (as has been described) whenever he was convinced not only that it could be maintained, but also that the interests of the public would be promoted thereby," and that this question of what the public interests required was committed to the absolute discretion of the attorney - general.   Judge LANDON, writing for the minority, queried : " Is it reasonable to suppose that the legislature, by the statutes in question, intended to authorize such governmental intervention," and said : " I concede that it is within the legislative power, in the absence of constitutional restriction, to provide for governmental intervention in private affairs." (P. 299.) It was held that the statute under review conferred upon the attorney-general the absolute power, whenever he deemed it wise, to commence an action in the name of the People, although relating to the administration of the private business of a corporation and that this being so the action was well brought.

But, in the second place, if we should assume that an action may be brought by the People, or by some person authorized to act for it, only where it appears as stated by Judge LANDON, " that the public interests are thereby to be protected, or in some substantial way promoted, apart from the mere private relief to be awarded to individuals," (p. 302) I think that the requirements of such rule would have been satisfied by the respondents under the admitted facts now before us.

Let us recall very briefly some of the things liable to result from the acts prohibited by the statute in question, as illustrated by experience at Saratoga Springs. The pumping of waters and gas for the purpose of extracting and vending the latter has resulted in the waste of great quantities of waters and of all the minerals held in solution therein, except some or all of the gas. Thus it has not only resulted in a waste of an important and valuable natural product, but because of the connected sources of supply underlying a large area, the rights of other persons than the violators desiring to draw from this common source have been unreasonably and unjustly destroyed or diminished and the value of a large amount of property imperiled. I have already endeavored to point out that this situation was one of sufficient public interest so that the legislature might deal with it as it has done by statute. It seems almost necessarily to follow that this protection of public interests would so continue as to permit the People to enforce obedience to its statutes after the same have been passed. But as an independent proposition, as was pertinently asked by Judge VANN in the *Ballard Case* (*supra*), " While the people have no pecuniary interests * * * have they no interests that need protection ? " (P. 292.) Only one answer, in my judgment, can be made to this question when it is asked, and that is that they have a substantial interest in the enforcement of the statute furnishing an all-sufficient basis for the maintenance of this action. They have an interest in the preservation of natural products like these mineral waters, and it fairly may be said that they have a substantial and enforceable interest in preserving the just and

reasonable use by all the members of a community of a common supply of a natural product and in so curtailing the attempts of one or a few to get an unjust proportion thereof, that the rights of other members of the community will not be interfered with and that disputes and litigation shall not be precipitated and that large amounts of property shall not be endangered.

These principles do not seem to be novel, but on the other hand to be sustained by ample authority.

The case of *Ohio Oil Company* v. *Indiana* (177 U. S. 190) has been referred to in other connections. It may be well here to call attention to the fact that the action was brought in behalf of the state by the attorney-general, without any relator, to enforce a statute intended to prevent the waste of gas or oil. What was said, however, would amply sustain the right of the state, if questioned, to maintain an action both preventing waste and securing just distribution to collective owners of such mineral waters. Apparently no one doubted the authority of the state to maintain the action, for no such question seems to have been presented.

In *Hudson Water Co.* v. *McCarter* (209 U. S. 349) an action was brought by the attorney-general of New Jersey to enforce a statute prohibiting the transportation of water into any other state. Again, the right of the state to maintain such an action does not seem to have been questioned by any one, but to have been fully affirmed, when it was said : " It sometimes is difficult to fix boundary stones between the private right of property and the police power when, as in the case at bar, we know of few decisions that are very much in point. But it is recognized that the state as quasi-sovereign and representative of the interests of the public has a standing in court to protect the atmosphere, the water and the forests within its territory, irrespective of the assent or dissent of the private owners of the land most immediately concerned." (P. 355.)

If these views are correct a cause of action has been alleged under the statute.

Some argument has been made that causes of action have

been improperly joined in the single count of the complaint before us. No such question is presented to us for consideration or involved in the questions which are presented.

The fourth and final question which has been certified to us relates to the power of the Supreme Court to grant the preliminary injunction which issued herein. This order was granted on the pleadings, including the verified complaint and numerous affidavits. While some of the affidavits presented in behalf of the appellant doubtless denied and, therefore, raised an issue of fact with some of the allegations of the complaint, such questions of fact were purely for the consideration of the court granting the injunction. Resolving them in favor of the respondents, as it was entitled to do and manifestly did do, the court was fully authorized on the facts and within the principles which we have approved to grant the injunction in question.

These views lead to an affirmance of the order appealed from, with costs, and lead us to answer the second, third and fourth questions which have been certified to us in the affirmative, and the first one in the affirmative to the extent hereinbefore indicated.

Haight, J. (dissenting). The facts and history of this case are correctly stated in the opinion of Hiscock, J. This action was brought to restrain the defendant from pumping water from the wells upon its premises and extracting therefrom the carbonic acid gas which is contained in such waters.

At common law the owner of land is entitled to all of the solids that lie beneath the surface and all of the liquids, other than surface streams, including gas, that percolate or flow through the soil or rocks that he is able to reduce to possession, and to use the same for his own purposes, at his free will and pleasure ; and if, in boring a well thereon, he intercepts an underground spring that destroys his neighbor's well no cause of action arises on the part of his neighbor. (*Acton* v. *Blundell*, 12 M. & W. 324, 351 ; *Chasemore* v. *Richards*, 7 H. L. Cas. 349 ; *Ellis* v. *Duncan*, 21 Barb. 230 ;

affd., 26 How. Pr. 601 ; *Pixley* v. *Clark,* 35 N. Y. 520 ; *Trustees of Village of Delhi* v. *Youmans,* 45 N. Y. 362; *Bloodgood* v. *Ayers,* 108 N. Y. 400; *Huber* v. *Merkel,* 117 Wis. 355 ; *Roath* v. *Driscoll,* 20 Conn. 533 ; *Greenleaf* v. *Francis,* 18 Pick. 117; *Davis* v. *Spaulding,* 157 Mass. 431; *Frazier* v. *Brown,* 12 Ohio St. 294; *Haldeman* v. *Bruckhart,* 45 Penn. St. 514 ; *Coleman* v. *Chadwick,* 80 Penn. St. 81 ; *Westmoreland Natural Gas Co.* v. *Dewitt,* 130 Penn. St. 235, 249 ; *Hague* v. *Wheeler,* 157 Penn. St. 324 ; *People's Gas Co.* v. *Tyner,* 131 Ind. 277, 280 ; *Ocean Grove Assn.* v. *Asbury Park Comrs.,* 40 N. J. Eq. 447 ; *So. Pac. R. R. Co* v. *Dufour,* 95 Cal. 615 ; *Brown* v. *Spilman,* 155 U. S. 665 ; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 208 ; Angell on Watercourses, §§ 109–114.)

It will be observed from the cases cited that the foregoing rule obtains not only with reference to water which is used for enriching the soil and for domestic purposes, but also to mineral waters, saline, alkaline and sulphuric, including petroleum oil and gas which percolates or flows through the earth beneath the surface, with but a single exception. In the case of *Forbell* v. *City of New York* (164 N. Y. 522) the city of Brooklyn, before it became consolidated with the greater city of New York, had acquired two acres of land in the county of Queens, upon which it had constructed a station, in which was sunk a number of wells through which, by means of powerful suction pumps, it had drawn the waters in the earth not only from its own land, but from a large territory surrounding it and by means of conduits conveyed the water to the city of Brooklyn where it was sold and distributed to the inhabitants thereof for domestic purposes. In that case it was found as a fact that the effect of the powerful suction pumps was to so lower the underground water-table in the lands surrounding that owned by the defendant as to render such lands unfit for cultivation and the growing of crops, thus resulting in great damage to the owners of such lands. This court held, and I think properly, that the facts of that case were so exceptional that they presented a situation not con-

templated by the common law or the prior cases recognizing the rights of the landowner to make such use of the water under the soil of the land as he saw fit and that, consequently, the owner was entitled to damages ; but in so holding the court was careful to limit the exception to the peculiar facts of that case and to re-affirm the common-law rule as to other cases, in order that the owner may have " the fullest enjoyment and usefulness of his land as land, either for purposes of pleasure, abode, productiveness of soil, trade, manufacture, or for whatever else the land as land may serve." (P. 526.)

Water, as it descends from the clouds, is nearly pure and consists of hydrogen and oxygen. It replenishes the earth, causes vegetation to grow and becomes an essential part of animal life. It is evaporated by heat or the rays of the sun, becomes a part of the air we breathe and when condensed it falls upon the earth enriching the soil and producing springs, brooks, creeks and rivers that flow upon the surface. Pure water is colorless, odorless, tasteless and a transparent liquid. These waters are distinguishable from those which are ordinarily known as mineral waters which are impregnated with foreign ingredients such as gas, sulphur, iron and salt which give them a peculiar flavor. The mineral waters that are produced by the springs of Saratoga are impregnated with carbonic acid gas and hold in solution salts which render them practically useless for domestic purposes, but which possess medical properties beneficial to health when taken in limited quantities. It, therefore, does not appear to me that the rule adopted in the *Forbell* case has any application to that presented by the complaint in this action. The fundamental difference is, that in the former case the land was dried up by reason of the suction of the water from it, and thus rendered incapable of producing vegetation, to the damage of the owner, while in this action the pumping of the water from the seams in the rock does not impair the usefulness of the soil for vegetation, but only tends to deprive the springs and wells upon the premises of the other owners of the gas necessary to make them flow. It is the gas, not the water, that

is the bone of contention. It, like natural gas and petroleum oil, has become of great commercial value and its production a prominent industry. If the rule in the *Forbell* case does apply to the facts presented in this case, and a person can be restrained from abstracting the gas from the waters which he pumps from his own premises, it would seem to follow that an owner might be enjoined from pumping salt water from his premises for the purpose of extracting the salt, or the pumping of wells for the purpose of extracting petroleum or gas. None of these products are beneficial to the soil, for they are destructive of vegetation, and their only value consists in their being separated from the soil, conveyed away and marketed for other purposes. To hold that any citizen may so restrain the owner of lands may result in the destruction of many of our great manufacturing establishments and operate to paralyze some of the most important industries of the country. I think that the rule which prevails with reference to salt water, petroleum oil and gas cannot be distinguished in principle from that which should control with reference to the mineral waters of Saratoga Springs. To my mind, the rule which obtains with reference to those commodities is settled by the authorities.

In the case of *Hague* v. *Wheeler* (157 Penn. St. 324) the defendant had bored a well upon his premises for the purpose of obtaining gas, but had failed in obtaining it in sufficient quantities to obtain a purchaser thereof for commercial use. The plaintiffs, who were operating gas wells upon adjoining premises, entered upon the defendant's lands and shut in the gas by closing the well. The defendant threatened to remove the cap and permit the gas to escape, and thereupon the plaintiffs brought action to obtain an injunction to prevent him from so doing. At that time there was no statute in Pennsylvania regulating the use that should be made of gas. The court held that, in the absence of such a statute, an injunction would not issue; that the owner could make such use of the gas that flowed from his well as suited his pleasure, and if he permitted it to waste, the plaintiff had no

cause for complaint.   Mr. Justice WILLIAMS, in delivering the opinion of the court, further says : " The owner of the surface is an owner downward to the center until the underlying strata have been severed from the surface by sale.   What is found within the boundaries of his tract belongs to him according to its nature.   The air and the water he may use.   The coal and iron and other solid mineral he may mine and carry away. The oil and gas he may bring to the surface and sell in like manner to be carried away and consumed.   His dominion is, upon general principles, as absolute over the fluid as the solid minerals.   It is exercised in the same manner and with the same results.   He cannot estimate the quantity of gas or oil as he might of the solid minerals.   He cannot prevent its movement away from him, toward an outlet on some other person's land, which may be more or less rapid, depending on the dip of the rock, or the coarseness of the sand composing it ; but so long as he can reach it and bring it to the surface, it is his absolutely, to sell, to use, to give away, or to squander, as in the case of his other property.   In the disposition he may make of it he is subject to two limitations.   He must not disregard his obligations to the public.   He must not disregard his neighbor's rights. If he uses his product in such a manner as to violate any rule of public policy or any positive provision of the written law, he brings himself within the reach of the courts.   If the use he makes of his own, or its waste, is injurious to the property or the health of others, such use or waste may be restrained, or damages recovered therefor ; but, subject to these limitations, his power as an owner is absolute, *until the legislature shall, in the interest of the public as consumers, restrict and regulate it by statute.*"

In the case of *Ohio Oil Co.* v. *Indiana* (177 U. S. 190) the state of Indiana, through its attorney-general, had filed a complaint against the Ohio Oil Company, charging it with the violation of a statute of the state which required the confining of natural gas within the pipes of the company and the prevention of its waste.   The oil company claimed that the act was violative of the provisions of the Constitution of the

United States. Mr. Justice WHITE, in delivering the opinion of the court, states the general rule quoted from the case of *Brown* v. *Spilman* (155 U. S. 665, 669, 670) to the effect that "petroleum, gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed *situs*, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property." He also quotes the rule from the case of *Hague* v. *Wheeler*, to which I have referred above, and numerous other cases, and reaches the conclusion that water, petroleum and gas flowing in subterranean currents are not the subject of property until they are reduced to possession, and then proceeds : "As to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. *They could not be absolutely deprived of this right which belongs to them without a taking of private property.* But there is a co-equal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. *Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their priv-*

*ilege to reduce to possession, and to reach the like end by preventing waste.*" (177 U. S. 190, 209.) It is thus apparent that, while the legislature may regulate the use by statute, in the absence of such statute an injunction will not issue under the common law, even though there may be a waste of the product. If, therefore, the mineral waters of Saratoga Springs are subject to the rules which obtain with reference to the other mineral liquids to which I have referred, it would follow that, in the absence of a statute regulating the use of such waters, an injunction would not lie at common law to restrain a landowner from taking, through his own wells upon his own premises, carbonic acid gas for the purposes of sale.

While the mineral waters of Saratoga Springs are not used for domestic purposes nor to aid vegetation, they, however, possess medical properties which are valuable, and the state, for the benefit of the whole people, may by statute regulate the production of such waters, to the end that the natural springs may be preserved from contamination or destruction. Take, for instance, the springs of Carlsbad, Wiesbaden, the Hot Springs of Arkansas and of Virginia, the springs of Mt. Clements, as well as those of Saratoga, which are visited annually by thousands of people and some of whose waters are bottled and shipped broadcast over the land and are used by thousands upon thousands of our inhabitants for medicinal purposes. Surely, the state, under its police powers, may, in the interests of the people, protect such great gifts of nature to mankind. I am, therefore, fully in accord with the views expressed by Judge HISCOCK in that portion of his opinion in which he discusses the police powers and reaches the conclusion that the legislature may, by statute, regulate the use.

I am not, however, able to sustain the validity of chapter 429 of the Laws of 1908. It does not attempt to regulate and preserve the production of the mineral waters of Saratoga Springs in order that the public may enjoy the medicinal properties contained in such waters; but the act, in most specific terms, absolutely prohibits throughout the entire state the pumping of waters from wells drilled into the rock for the

purpose of extracting the carbonic acid gas contained therein, excepting only the salt reservation at Syracuse and the counties adjoining thereto. The industry is not regulated, but is absolutely prohibited, except as to the reservation mentioned. The defendant, as we have seen, is engaged in that business. It has purchased lands and constructed a plant thereon, and has bored wells into the rock thereunder, from which it extracts the gas. Its wells do not flow, and, consequently, a pail of water cannot be taken therefrom unless by the use of a pump or other artificial means. The water, after the extraction of gas, has no commercial value, and is, consequently, returned to the earth from which it was taken. If the defendant is prohibited from pumping water, it follows that it is also prohibited from extracting any gas therefrom or of deriving any benefit from the use of its wells. The gas is of great commercial value, and the industry is an important one. Until the passage of this statute the business was lawful and legitimate. It was neither immoral, a nuisance, nor detrimental to public health, as was the case of *Mugler* v. *Kansas* (123 U. S. 623) and other kindred cases; but was an absolute right of property, which the defendant in good faith had developed by constructing an expensive plant for the extraction of gas, from which, after its establishment, the right of extraction has been prohibited by legislative act without any provision for compensation. This, I am of the opinion, should not be tolerated. As was said by Mr. Justice WHITE in the *Ohio Oil Company* case, above referred to (p. 209), "The surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. *They could not be absolutely deprived of this right which belongs to them without a taking of private property.*" (See, also, *People ex rel. McPike* v. *Van De Carr*, 178 N. Y. 425.) Had the defendant's plant been located elsewhere than in the vicinity of Saratoga Springs no court would have entertained, for a moment, the suggestion that it could be restrained of its right to extract the gas, but being located in that vicinity and upon the basin from which the springs of

that place draw their waters and gas, each of the surface proprietors being entitled to convert a part of the common product to actual possession, presents a case in which, to again use the language of Mr. Justice WHITE in the Ohio case, "*the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their privilege to reduce to possession, and to reach the like end by preventing waste.*" (P. 210.) I, therefore, conclude that, while the legislature may regulate the use by surface proprietors of lands in extracting gas therefrom so as to preserve the rights of each proprietor of the common field in which the gas may be found to exist, without rendering compensation therefor, yet where the legislature takes from the surface proprietor, absolutely, his right to so produce gas, it is a taking of private property for which compensation must be made, and, inasmuch as the act in question does prohibit the defendant from the exercise of this right, it is violative of both the State and Federal Constitutions. I favor a reversal of the order appealed from.

GRAY, EDWARD T. BARTLETT, WERNER and CHASE, JJ., concur with HISCOCK, J ; CULLEN, Ch. J., concurs in result; HAIGHT, J., reads dissenting opinion.

Order affirmed.