In the Matter of the CITY OF SYRACUSE, Respondent, against JOHN T. GIBBS et al., Constituting the WATER POWER AND CONTROL COMMISSION, Appellants.

Argued April 25, 1940; decided July 24, 1940.

*John J. Bennett, Jr., Attorney-General* (*Timothy F. Cohn, Henry Epstein* and *Jack Goodman* of counsel), for appellants. The Water Power and Control Commission had jurisdiction to make the determination involved herein. (*Starbuck* v. *Starbuck*, 173 N. Y. 503; *Matter of City of New York [Court House]*, 216 N. Y. 489; *People* v. *Raquette Falls Land Co.*, 100 Misc. Rep. 601; 188 App. Div. 943; *Sanborn* v. *Sanborn*, 106 Ohio St. 641; *Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm.*, 267 N. Y. 265; *Grand Rapids and Indiana Ry. Co.* v. *Osborn*, 193 U. S. 17; *Bankers Trust Co.* v. *Raton*, 258 U. S. 328; *Fowler* v. *Saks*, 7 Mackey [D. C.], 570; *United States* v. *Lowden*, 308 U. S. 225.) The determination is supported by sufficient competent proof, and is, therefore, not arbitrary or capricious. (*Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm.*, 267 N. Y. 265.)

*John C. McLaughlin* for Village of Jordan, intervener. Where the Legislature has created a fact finding body or commission, and it has taken testimony and made its decision, the courts have no authority to substitute their own judgment in place of the decision of the commission. (*Matter of New Rochelle Water Co* v. *Maltbie*, 248 App. Div. 66; *People ex rel. Freeborn & Co.* v. *Graves*, 257 App. Div. 587.)

*James C. Tormey, Corporation Counsel* (*George T. Driscoll* of counsel), for respondent. The Legislature granted exclusive control over the Syracuse water system to the

city of Syracuse. (L. 1888, ch. 532; L. 1889, ch. 291, subd. 3; L. 1890, ch. 314; L. 1892, ch. 27; L. 1894, ch. 184; L. 1905, ch. 723; L. 1906, ch. 631; L. 1909, ch. 156; L. 1921, ch. 499; Cons. Laws, ch. 65, § 528; *Trenton* v. *New Jersey*, 262 U. S. 182.) The Water Power and Control Commission did not acquire jurisdiction over the Syracuse water system. (*People ex rel. Municipal Gas Co.* v. *Public Service Comm.*, 224 N. Y. 156; *Matter of Village of Boonville* v. *Maltbie*, 272 N. Y. 40; *Matter of Boston & Albany R. R. Co.*, 53 N. Y. 574; *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244; *People ex rel. Iroquois Gas Corp.* v. *Public Service Comm.*, 264 N. Y. 17; *Matter of Beauty Spring Water Co.*, 134 App. Div. 17; *Potts* v. *Village of Haverstraw*, 79 Fed. Rep. [2d] 102; *Westchester Joint Water Works* v. *Pelham*, 148 Misc. Rep. 349; 241 App. Div. 687; *Matter of Albany County*, 43 St. Dept. Rep. 666.) The proof does not support the decision rendered by the Commission. (*Smythe* v. *Ames*, 169 U. S. 466; *People ex rel. Cons. Water Co.* v. *Maltbie*, 275 N. Y. 357; *Matter of New York Water Service Corp.* v. *Water Power & Control Comm.*, 257 App. Div. 590; *Matter of Cote* v. *Longley*, 241 App. Div. 539; *Buffalo Structural Co.* v. *Dickinson*, 98 App. Div. 355; *Curry* v. *Quait*, 100 Misc. Rep. 604; *Anderson* v. *Leblang*, 125 Misc. Rep. 820.)

Rippey, J. On March 19, 1935, the Water Power and Control Commission made its order approving the plans of the village of Jordan for the construction and operation of a municipal water system by means of which it might be enabled to procure an adequate supply for its inhabitants of pure and wholesome water from Skaneateles lake (Application 921; 50 St. Dept. Rep. 526). The order, in part, authorized the village to tap into the mains of the village of Elbridge and, by that means, to draw off from the Elbridge supply sufficient water for its requirements. Elbridge, in turn, procured all of its supply from the conduits of the city of Syracuse through which flowed waters from Skaneateles lake under authorization of the Commission by order dated November 25, 1931 (Application 670; 41 St. Dept. Rep. 345). Negotiations between the village of Jordan and the city of

Syracuse for agreement as to the quantity of water which the village might draw from the city conduits through the Elbridge mains and the service rate which it should pay to the city for the use of the city conduits in supplying the water failed. As a consequence of the failure of the parties to agree, the village of Jordan filed its application with the Commission (No. 1049) on February 21, 1936, to procure a determination of those questions. Upon that application, after due notice and a full hearing, the Commission made its order under date of August 21, 1936, by which the village was allowed to withdraw a quantity not in excess of sixty-nine million gallons in any one calendar year and the service rate was fixed at two cents per hundred cubic feet of water withdrawn (55 St. Dept. Rep. 251). The order provided that the water should be delivered, taken and paid for in accordance with the provisions of Water Applications 609, 670 and 921 and should remain in force for five years from the date of the order. In proceedings instituted by the city under article 78 of the Civil Practice Act, the determination and order of the Commission were annulled by the Appellate Division and from the order entered upon its decision the Commission has appealed to this court. The majority of the lower court has held that the Commission was without jurisdiction to make the order. The court was unanimously of the opinion that, in any event, the service rate fixed was unreasonable and the determination as to that arbitrary and capricious.

Skaneateles lake is a body of water approximately fifteen miles in length with an average width of about one mile, lying and extending generally in a northerly-southerly direction in Onondaga, Cayuga and Cortland counties. Its inlet is at the southerly end of the lake whose source, in turn, is many miles distant in Cortland county. The surface area of the lake is approximately thirteen square miles and its watershed is about seventy-five square miles. Its outlet is Skaneateles creek, about ten miles long, commencing at the foot or northerly end of the lake at the village of Skaneateles and extending generally in a northerly

direction until it empties into Seneca river at the village of Jordan, the river, at that point, now being a part of the Barge Canal System of the State. The lake is about seven miles from the village of Elbridge, about ten miles from Jordan and about nineteen miles from the city of Syracuse. Its elevation above Elbridge is upwards of three hundred feet, above Jordan is about four hundred fifty feet and in excess of those figures above the city of Syracuse. Before the city of Syracuse about 1894 and other municipal units later tapped the lake for their water supply, the outlet was a source of power for mills, manufacturing plants and factories located along its course, for the supply of water needed by the inhabitants of the town of Elbridge and of the villages of Elbridge and Jordan located therein, the means of removal of pollution arising throughout the drainage basin and a feeder for the old Erie canal which passed through the village of Jordan, but since that time such source of supply has been partially, if not wholly, removed. The Commission has found that the lake and its tributaries and outlet are the only logical, normal and natural sources of water supply for the entire drainage basin and also for any part of the towns of Skaneateles and Elbridge, Onondaga county, and the easterly part of the town of Sennett, Cayuga county, and of the inhabitants thereof who were declared to have a right to be so supplied superior to the rights of the city of Syracuse.

Various local acts of the Legislature have to do with the creation of the waterworks system of the city of Syracuse and its procurement and use of a water supply from Skaneateles lake (L. 1888, ch. 532; L. 1889, ch. 291; L. 1890, ch. 314; L. 1892, ch. 27; L. 1894, ch. 184; L. 1894, ch. 360; L. 1906, ch. 631; L. 1909, ch. 156; L. 1918, ch. 449; L. 1923, ch. 271; L. 1930, ch. 66; L. 1931, ch. 796). At the outset, the city challenges the power of the Commission to interfere with its alleged exclusive ownership of, use of, and control over the waters of Skaneateles lake or to grant the order here involved. The city undertakes to include the waters of Skaneateles lake within its waterworks system and then

urges that the Legislature granted exclusive control over the Syracuse water system to the city of Syracuse. For its alleged exclusive grant, it relies upon the above listed acts passed prior to 1905 and upon the later acts referred to for confirmation of such grant. It is urged that, by those statutes, the Legislature not only freed it from any control whatsoever by the Water Power and Control Commission and its predecessor water control commissions but gave it absolute power over all the waters of the lake — to use and dispose of them within its own jurisdiction for whatsoever price it may charge and elsewhere at such price as it or the Legislature by local law might elect to impose. We find no justification in any provisions of those acts for any such contention.

We need not pause to make a detailed analysis of those acts. Suffice it to say that the city of Syracuse was given the right to take water from the lake, not required by the State for use by the Erie canal, through a single conduit of not more than thirty inches in diamater for the purpose of supplying the city and its inhabitants with water subject to and conditioned, however, upon various limitations and restrictions, subject to State control and to the rights of others, riparian or otherwise, to the use of waters collected from the watershed and impounded in the lake. Referring to section 18 of the act of 1889, that being the section under which power to take water and rights to the city were granted, as amended by chapter 314 of the Laws of 1890, this court said: " The rights of the city in and to the use of the surplus waters of the lake, conferred by the act, were expressly declared to be at all times subject to the superior claims of the state thereto " (*Sweet* v. *City of Syracuse*, 129 N. Y. 316, 328). In connection with the question of whether the city acquired by any provision of those acts any property right, the question arose as to whether any public property was appropriated for local or private purposes in violation of constitutional prohibitions. It was held that the State had no property right to give or convey in and to the waters of the lake or to the waters flowing

through its outlet and no such right could be conveyed, or was attempted to be conveyed, to the city by the acts in question. The court said (pp. 335, 336): "Neither sovereign nor subject can acquire anything more than a mere usufructuary right therein, and in this case the state never acquired, or could acquire, the ownership of the aggregated drops that comprised the mass of flowing water in the lake and outlet, though it could and did acquire the right to its use. * * * We think that the conditions of the grant to the city of Syracuse are such that no property right or interest which the state has or ever had is transferred, lost or impaired. After all the provisions of the statute are executed the state will possess and enjoy every right, with respect to those waters, that it did before and, if this is so, then no public property is transferred by the act from the state to the city." We likewise find clear and unambiguous expressions in the early acts negativing the contention of the city. It is said in the act of 1890 with reference to comparative rights to use: "It being understood that the rights of the city of Syracuse hereby conferred in and to such surplus waters, are to be subject always to the superior claims of the state thereto." In chapter 631 of the Laws of 1906, all provisions of former acts not inconsistent with its provisions are saved and section 7 provides: "This act * * * shall be construed not as an act in derogation of the powers of the state but as one intended to aid the state in the execution of its duties," etc. The acts passed by the Legislature subsequent to 1906 did not extend to the city any rights to the use of the water of the lake not contained in the previous acts. They provided largely if not entirely permission to dispose of some of the waters taken from the lake by the city of Syracuse to public institutions and to other units outside of the territorial jurisdiction of the city at prices directed to be imposed for such services. We are not concerned in this case with any question concerning the constitutionality of those acts.

We, therefore, are bound to conclude that, by those acts of the Legislature, no exclusive dominion over the waters was given or intended to be given by the State. By the

express language used, a contrary intent was clearly expressed. But, even though the intent of the Legislature had been such as the city claims, its purpose could not have been constitutionally accomplished (*Smith* v. *City of Rochester*, 92 N. Y. 463; *Sweet* v. *City of Syracuse, supra*). It was the duty of the State to control and conserve its water resources for the benefit of all the inhabitants of the State. The public right to the benefit of such resources is an incident of sovereignty. The Legislature, when acting within constitutional limitations and in the interest of the public, may, at will, grant, withhold, or condition the privilege to a municipality of taking water from a public source (*Sweet* v. *City of Syracuse, supra; City of Trenton* v. *State of New Jersey*, 262 U. S. 182; *People ex rel. Burhans* v. *City of New York*, 198 N. Y. 439; *Ives* v. *South Buffalo Ry. Co.*, 201 N. Y. 271, 300, 301; *Hathorn* v. *Natural Carbonic Gas Co.*, 194 N. Y. 326). The Legislature may delegate the performance of its duty to an agency or commission, but the agency can act only within the scope of the powers delegated expressly or by necessary implication to enable it to carry out the powers expressly given (*People ex rel. Municipal Gas Co.* v. *Public Service Comm.*, 224 N. Y. 156, 165). Whatever the city got by the statutes upon which it relies was subject to the reserve powers of the State to control, in the public interest, the use of the waters of the lake (*People ex rel. Burhans* v. *City of New York, supra; Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm.*, 267 N. Y. 265, 276).

Limited power was committed to the " state water supply commission " by chapter 723 of the Laws of 1905, amended by chapter 415 of the Laws of 1906, wherein it was provided that " no municipal corporation or other civil division of the state, and no board, commission or other body of or for any such municipal corporation or other civil division of the state shall, after this act takes effect, have any power to acquire, take or condemn lands for any new or additional sources of water supply, until it has first submitted the maps and profiles therefor to said commission, as hereinafter

provided, and until said commission shall have approved the same " (§ 2). By chapter 56 of the Laws of 1909, the foregoing provision became section 6 of article 2 of the State Boards and Commissions Law (Cons. Laws, ch. 54) and the State Water Supply Commission was continued (§ 5). By chapter 285 of the Laws of 1910, chapter 56 of the Laws of 1909 was amended but there was no change in the name of the commission or in its powers as above specified. Those acts were limited to situations where the applicant desired " to acquire, take, or condemn lands for any new or additional sources of water supply " and, unless such power of condemnation of land was sought, the city had the right to lay its second conduit without the approval of that commission. The second conduit was laid by the city in 1910 and the capacity thereafter of intake No. 1 and of the two conduits was about thirty-two million gallons daily. The Conservation Law (Cons. Laws, ch. 65) was enacted in 1911 (L. 1911, ch. 647) with a " division of water power and control " by which the above statutes as embodied in chapter 56 of the Laws of 1909 were repealed and the Legislature provided that the Conservation Department should have all the powers and be subject to all the duties of the Water Supply Commission as then fixed by law, created a commission and further provided that " the commission shall have the powers and perform the duties in relation to the supply of potable waters for the various municipalities, civil divisions and inhabitants of the state, set forth in this article, and as may be further provided by law " (§ 520). At that time the provisions of section 6 of chapter 56 of the Laws of 1909 were carried over to the Conservation Law and there were added the words, so far as material, that no power existed " *to acquire, or to take a water supply or an additional water supply* " without the approval of the commission having jurisdiction over water supply. We need not further trace the statutory changes affecting control over the water resources of the State except to say that the Water Power and Control Commission was created by chapter 619 of the Laws of 1926 by what has,

by amendments, finally emerged as section 396 of the Conservation Law with powers and duties carried over from the antecedent statutes (Conservation Law, § 399). Without change since 1911, no municipal unit has been permitted " to acquire, or to take a water supply or an additional water supply " without the approval of the commission in charge (Conservation Law, § 521).

Consequently, since 1911, no authority existed by which the city of Syracuse could secure an additional supply of water from Skaneateles lake without the approval of its plans by the suitable commission through the Conservation Department. It had conceived the need of an additional supply of water subsequent to the construction of No. 2 conduit and planned to construct a second intake in the lake, to make required additions to the gatehouse in the village of Skaneateles and to build an additional or a No. 3 conduit extending from the lake to the city. It needed to provide for a possible withdrawal of fifty-six million gallons per day as against thirty-two million gallons maximum permissible under the then existing conditions. It started to construct the third conduit without application to any water control authority but had apparently postponed its completion. In 1931 the need of the additional supply became acute. Recognizing the need to procure the approval of the Commission of its plans before it could proceed with the new construction and before it could take any additional water supply from Skaneateles lake or condemn lands and rights as were needed to carry out the project, the city filed its plans and duly made application in writing to the Water Power and Control Commission on September 22, 1931, for approval and ratification of work already done and for authority to complete the work and to withdraw the additional water supply (Application No. 609; 41 St. Dept. Rep. 28).

It was then the duty of the Commission, before approval could be given, to determine (1) " whether the plans proposed are justified by public necessity," (2) " whether they

provide for the proper and safe construction of all work connected therewith," (3) " whether they provide for the proper protection of the supply and the watershed from contamination or provide for the proper filtration of such additional supply," (4) " whether such plans are just and equitable to the other municipalities and civil divisions of the state affected thereby and to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water supply, and whether said plans make fair and equitable provisions for the determination and payment of any and all legal damages to persons and property, both direct and indirect, which will result from the execution of said plans or the acquiring of said lands " (Conservation Law, § 523).  In performance of its duties, the Commission proceeded to hearing of the application and, after hearing all parties interested, made its findings and decision on the testimony taken and the facts presented, which decision, within its jurisdiction, is conclusive on the courts (*Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm.*, 267 N. Y. 265, 268).  It ratified what had previously been done with some reservations not here important, modified and approved the plans as modified and authorized the city to divert water from the lake in an amount not in excess of fifty-six million gallons per day, subject to certain conditions, restrictions and limitations, which, in view of its duties as fixed by the Legislature, it had the power and it was its duty to impose, as follows:

" 6. The Commission reserves the right from time to time to authorize the amount of water found reasonably necessary for the supply of other parts of the State and the inhabitants thereof to be taken from Skaneateles lake and applicant shall have no claim for compensation for the water so diverted, unless it shall render a service in connection therewith;

" 7. Skaneateles lake and the tributaries and outlet thereof are hereby declared to be the natural and proper sources of water supply for all parts of the drainage basin

thereof and also for any part of the towns of Skaneateles or Elbridge, Onondaga county, and the easterly part of the town of Sennett, Cayuga county, and of the inhabitants thereof. These inhabitants are hereby declared to have a right so to be supplied superior to the rights of the city of Syracuse and applicant may draw from this lake only water which is in excess of the reasonable needs of these inhabitants and, in default of service rendered, shall have no claim for compensation or for damage by reason thereof;

" 8. Any municipality, water district or similar political subdivision of the State situated in or including any part of all of the towns and parts of towns above named may apply to this Commission for permission to take the water needed for the supply of such applicant and the inhabitants thereof from any pipe line or conduit owned by the city of Syracuse. On approval of such application said city shall permit the necessary connections to be made to its conduits and shall furnish such water, subject to such terms and conditions as may be specified by this Commission in its decision approving and authorizing such taking. All taps and connections shall be made and the necessary meters installed and maintained at the expense of the taker or takers of the water. Connections shall be made in conformity with the reasonable requirements of the proper authorities of the city of Syracuse. Syracuse shall be paid for the water so taken at the rate which may be agreed upon between that city and the taker of the water, or, if they cannot agree, shall, on application of either party, be fixed by this Commission."

The city accepted the determination and acted upon it, necessarily assumed and agreed to any burdens it imposed and is not now in any position to question the propriety of the limitations, conditions or restrictions fixed or the power of the Commission to impose them (*Matter of City of New York*, 216 N. Y. 489; *Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm., supra*), even though the determination had been *ultra vires* and void (*People* v. *Raquette Falls Land Co.*, 100 Misc. Rep. 601; affd., 188 App.

Div. 943). Later proceedings before the Commission also emphasize the estoppel. (1) In Application No. 670, filed by the village of Elbridge on October 23, 1931, the applicant, on November 25, 1931, was authorized by the Commission to construct a water supply system and take its water supply by tapping into at least two of the conduits of the city of Syracuse. The city objected to the power of the Commission to permit interference with its water-works system or with its alleged exclusive rights to the Skaneateles lake water supply under chapter 631 of the Laws of 1906 and antecedent acts of the Legislature. The determination of the Commission to allow Elbridge to take the water from the Syracuse mains was based not only upon the merits of the application but, in large part, on the conditions and reservations contained in Application 609. In that determination the city also acquiesced and is fur- nishing Elbridge water through its mains and through the tap, the construction of which the Commission author- ized. (2) On February 2, 1935, the village of Jordan filed Application No. 921 with the Commission for authority to construct a water system and procure its supply from Skaneateles lake through the Syracuse conduits by tapping into the mains of the village of Elbridge. Due notice of the application was published and hearing held and, on March 19, 1935, the application was granted expressly under the conditions and reservations of power contained in Applica- tion 609. The water system was accordingly constructed and Jordan has since used water from the Syracuse conduits through the tap in the Elbridge mains. The city of Syra- cuse has taken no steps to review that determination. In any event, the imposition of those conditions was a necessary incident to the power of the Commission to approve Application No. 609.

Application No. 1049, the subject of the present proceed- ing, is based upon the authority reserved for its benefit by the Commission in granting approval of the city's Application 609. The reasonableness of the quantity which Jordan may take from the city conduits and the necessity

for Jordan to procure its water supply from Skaneateles lake are fully sustained by the evidence and are not open here for attack. Neither was the fixing of the rate per hundred cubic feet of water taken by the village as a service charge arbitrary or capricious. The service rate to be charged was the sharply contested question in the case. The Commission had previously provided that the city should " have no claim for compensation for the water so diverted, unless it shall render a service in connection therewith " (Application 609) and to this condition the city consented when it accepted the benefits of the approval of its plans to take the additional water supply from the lake. No part of the water taken by the village passes through the city mains within the city of Syracuse. It is taken through the Elbridge tap of the city conduits about five and one-half miles from the lake and about twelve or thirteen miles from Syracuse. The actual service to be rendered by the city, the testimony shows, includes " the use of part of the services of the city connection, attending to the maintenance of the watershed of Skaneateles lake and attending to the operating and maintaining of the city intakes in Skaneateles lake, the gates, the chlorinating equipment and chlorinating the water and part of the conduit or conduits up to the point of tap." Rates for service charges were fixed under applicable principles adopted by the Commission on August 20, 1936, which are shown to be sound under good engineering practice. The total annual cost to the city, after considering interest on investment and actual expenditures exclusive of debt service, of delivering water from the lake to the Elbridge tap was found to be $266,357, some $6,000 more than testified to by the city engineer or 1.82 cents per hundred cubic feet on the basis of $24.32 per million gallons. The city engineer testified that the cost was $24 per million gallons. Other testimony and records were considered by the Commission. The service rate was fixed at 2 cents per hundred cubic feet taken. It is immaterial what other communities may voluntarily pay to the city under

other conditions of necessity and service for water delivered to them whether under unwarranted assumptions of the legal rights of ownership by the city of the waters delivered or not. The question of fact as to the propriety of the service rate fixed was one for determination by the Commission on the facts presented here. There being sufficient evidence to support its finding, its determination is conclusive on the courts (*Matter of Niagara Falls Power Co.* v. *Water Power & Control Comm., supra*).

The order of the Appellate Division should be reversed, with costs, and the determination of the Commission affirmed.

LEHMAN, Ch. J., LOUGHRAN, FINCH, SEARS, LEWIS and CONWAY, JJ., concur.

Order reversed, etc.