*320 OPINION OF THE COURT
Francis T. Collins, J.
Claimant, Erie Boulevard Hydropower, L.E (Erie), moves pursuant to CFLR 3212 for partial summary judgment on the issue of defendants’ liability for breach of a 1921 agreement governing the release of water from the Hinckley Reservoir for use in its hydroelectric facilities. Defendants[1] cross-move for summary judgment dismissing the claim.
The 1921 agreement at issue resolved claims by Utica Gas & Electric Company (Utica), Erie’s predecessor in interest, against the State arising from its appropriation of certain lands and riparian rights owned by Utica “for the purpose of impounding and storing water flowing in West Canada Creek at that point, and thereby providing a water supply for the improved Erie Canal” (claimant’s exhibit 3, 1921 agreement at 2). As a result of the appropriation of its property and riparian rights, Utica filed a total of 23 claims seeking an aggregate amount of $1,119,425 in the Court of Claims (see claimant’s exhibit 3, 1921 agreement at 2). In consideration of Utica’s release of its claims, the State agreed to pay the sum of $100,000 and to maintain the Hinckley Reservoir:
“so far as practicable and consistent with the dominant use of the same for canal purposes and to discharge the water impounded therein into the natural channel of West Canada Creek below said Hinckley State Reservoir, and above the riparian lands of [Utica] situated on the West Canada Creek below said reservoir in the manner set forth in the operating diagram hereto attached” (claimant’s exhibit 3, 1921 agreement at 3).
A quit claim deed reflecting Utica’s rights to the release of water from the Hinckley Reservoir was to be executed and delivered to Utica in the form attached to the agreement. The deed reflects the rights of the parties as set forth in the 1921 agreement.
Erie alleges in its claim that between September 24, 2007 and October 23, 2007 releases from the Hinckley Reservoir should *321 have been at or between 370 cubic feet per second and 400 cubic feet per second pursuant to the operating diagram specifically incorporated into the 1921 agreement. Erie contends further that during the above period defendants reduced releases from the reservoir to levels below those required by the operating diagram for reasons unrelated to the operation of the canal. In particular, claimant argues that the 1921 agreement allows for deviations from the operating diagram only for (i) purposes related to operation of the canal or (ii) to allow repairs and/or maintenance of the Hinckley Reservoir dam. Erie argues the unauthorized deviation from the terms of the operating diagram constituted a breach of the parties’ 1921 agreement, which forced it to reduce or discontinue hydroelectric power generation at its downstream facilities resulting in a loss of revenue for which it seeks compensation.
The Mohawk Valley Water Authority (MVWA) is a public authority which uses the Hinckley Reservoir to supply drinking water to the City of Utica and several other municipalities in the Mohawk Valley region. Erie contends the defendants deviated from the operating diagram and reduced the amount of water released to its downstream facilities as the result of pressure brought to bear by MVWA and others concerned that the combination of severe drought and reduced water levels in the reservoir threatened MVWA’s ability to deliver water to its customers. According to Erie, such a deviation from the operating diagram for purposes other than “canal uses” or the repair of the dam constitutes a breach of contract warranting judgment in its favor on the issue of liability as a matter of law.[2]
In addition to the contract and various extrinsic evidence, claimant supports its motion with an acknowledgment by *322 counsel for the State in MVWA’s declaratory judgment action in the Supreme Court, that the 1921 agreement did not make provision for the rights of MVWA or its predecessor in interest. In that case, MVWA sought a declaration that it “has an absolute and unconditional right to use up to 75 c.f.s. [cubic feet per second] of water from the West Canada Creek at Hinckley [R]eservoir” and that to the extent its rights may be restricted by its 1917 agreement with the State to provide a compensating reservoir, no such restrictions may be enforced against it (see Mohawk Val. Water Auth. v State of New York, 78 AD3d 1513, 1514 [2010], lv denied 17 NY3d 702 [2011]).[3] In opposition to MVWA’s motion for summary judgment and in support of its cross motion on its counterclaim alleging breach of MVWA’s 1917 agreement to provide a compensating reservoir, defense counsel stated
“there is no provision in the 1921 Stipulation Agreement which permits the State or the Canal Corporation to reduce the downstream releases from Hinckley below the rate called for by the 1920 Operating Diagram in order to maintain a specific reservoir level associated with the Water Authority’s use of the reservoir” (claimant’s exhibit 7, affirmation of Roger B. Williams 1i 23).
Erie contends counsel’s statement is an admission which supports summary judgment on the issue of liability in its favor.
Also submitted in support of claimant’s motion are excerpts from the examination before trial of the State’s hydrologist, Howard M. Goebel, and various reports and correspondence relating to MVWA’s use of the reservoir. Mr. Goebel testified that he did not recommend deviating from the operating diagram to alleviate MVWA’s concerns regarding the 2007 drought because, in his opinion, no such deviation was necessary (claimant’s exhibit 8, examination before trial testimony of Howard M. Goebel at 60). Mr. Goebel explained that “[t]he one beauty of the 1920 Operating Diagram is the self-correcting nature, and that if reservoir levels would continue to fall, with time, the corresponding release would also decrease” (id. at 70-71). In this *323 way, according to Mr. Goebel, reservoir levels could be maintained “for canal navigation” for a longer period of time (id. at 71). Moreover, MVWA’s intake pipe for its water supply was the lowest in the Hinckley Reservoir and it was, therefore, unlikely that reservoir water levels could impact MVWA’s water supply (id. at 72).
Mr. Goebel was of the view that although Hinckley Reservoir is utilized by several downstream entities, it was constructed for the “sole purpose” of providing water to the barge canal (claimant’s exhibit 13,; mem from Howard M. Goebel dated Apr. 27, 2004, 1i 2). According to Mr. Goebel,
“[t]he 1920 Operating Diagram does not account for [MVWA’s] water supply withdrawals from Hinckley Reservoir since the upstream compensating reservoirs, required by the 1917 Agreement, were intended to result in a no net impact of water supply withdrawals on Hinckley Reservoir. As of 2002, there are no upstream compensating reservoirs” (claimant’s exhibit 14, mem from Howard Goebel dated Sept. 29, 2004).
Although Mr. Goebel acknowledged that without the compensating reservoir required by the 1917 agreement, the supply of water may be inadequate to meet MVWA’s needs in a drought, he opined based upon his familiarity with the contractual relationship of the parties that “[t]he remedy for expansion of MVWA’s utilization of Hinckley Reservoir is provided in the 1917 agreement through construction of additional compensating reservoirs” (claimant’s exhibit 13, mem from Howard M. Goebel dated Apr. 27, 2004, 1f 6).
Defendants cross-move for summary judgment dismissing the claim, first on the ground that they did not breach the 1921 agreement in issue because the agreement permitted deviation from the operating diagram in a drought. Defendants contend that the State has a paramount interest in protecting the municipal water supplies as reflected in Environmental Conservation Law § 15-0105 (5). Read together with the contract provision permitting deviations from the operating diagram during a drought, defendants argue that summary dismissal of the claim is warranted (defendant’s mem of law at 10). Sworn statements from Mr. Goebel and Michael Fleischer, Executive Director of the New York State Thruway Authority and New York State Canal Corporation, were submitted in support of this contention. Mr. Goebel avers that although he was of the opinion that the 2007 deviations from the operating diagram were unneces *324 sary to safeguard MVWA’s water supply, he “fully support[s] the Canal Corporation’s authority to [deviate from the operating diagram] as well as the underlying policies associated with the actions taken, regardless of whether [his] technical perspective may have differed from the views presented by other interested parties” (affidavit of Howard M. Goebel If 31). Mr. Goebel indicates that Mr. Fleischer’s decision to reduce water releases “based upon policy concerns regarding the threat to the public drinking water supply of the Utica area during the drought conditions experienced in 2007 were reasonable and justified” (affidavit of Howard M. Goebel If 33).
Mr. Fleischer indicates in his affirmation that the determination to deviate from the operating diagram was made after consultation with representatives from MVWA, the Oneida County Health Department, the New York State Emergency Management Office and the Department of Environmental Conservation. He states his belief that he was statutorily obligated “to give top priority to the storage of water in Hinckley Reservoir for domestic and municipal purposes over all other purposes” (Fleischer affidavit If 34, citing ECL 15-0105 [5]).
The fact that 2007 was an unusually dry year in the Hinckley watershed is established by the affidavit of Emmet M. Owens, Jr., a Senior Research Engineer at the Upstate Freshwater Institute, Inc. Mr. Owens specifically indicates in his affidavit that by the end of August 2007, “the reservoir was subject to drought conditions, based upon the historic record of surface elevation and measured inflow” and that these drought conditions continued until on or about October 22, 2007 (affidavit of Emmet M. Owens, Jr. 1Í14). The minimum surface elevation of the reservoir in 2007 was 1,188.66 feet which occurred on September 27, 2007, according to Mr. Owens. Prior to that time, the Hinckley Reservoir had not fallen below 1,188.6 feet since January 1, 1989 (affidavit of Emmet M. Owens, Jr. If 7). Thus, defendants contend that pursuant to the express terms of the agreement, which they contend permit a deviation from the operating diagram in an unusual drought, the contract was not breached. Given the paramount interest of the State in securing municipal water sources, defendants contend summary judgment dismissing the claim is required.
Defendants alternatively contend that even if deviations from the operating diagram for the purpose of protecting the City of Utica’s water supply were not permitted by the terms of the 1921 agreement, application of the laches doctrine forecloses *325 Erie from pursuing its claim. In this regard, Mr. Owens details a history of deviations from the operating diagram based upon daily release data and reservoir surface elevations for the 24-year period beginning January 1987 and ending October 2011. Based on this information, defendants argue that Erie’s history of acquiescing to such deviations, “often to protect the Utica water supply,” establishes a valid laches defense and warrants dismissal of the claim as a matter of law (defendants’ mem of law at 12-13). While Erie does not dispute that it previously consented to deviations from the operating diagram for the purpose of securing municipal water supplies, it contends that conditions materially changed in 2002 when MVWA breached its predecessor’s 1917 agreement to maintain a compensating reservoir. As a result, Erie contends that no unreasonable delay in asserting its contract rights occurred.[4] Claimant also argues that defendants waived their laches defense by failing to assert it in their answer and, in any event, the defense is inapplicable to actions at law commenced within the appropriate statutory period. Defendants contend in reply that MVWA’s compensating reservoir, known as the Gray Reservoir, had been decommissioned and unavailable as a source of compensating water flow since at least 1984. As a result, the removal of the Gray Reservoir in 2002 could not have provided the impetus for Erie’s decision to withhold its consent to the deviation from the operating diagram which occurred in 2007.
The law is clear that a settlement agreement, such as the 1921 agreement in issue here, is a contract which, like any other agreement, must be interpreted in accordance with the well-settled principles of contract interpretation which require that “when parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms” (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [internal quotation marks and citation omitted]; Brad H. v City of New York, 17 NY3d 180, 185 [2011]). Nowhere is this basic tenet of contract interpretation more important than in real property transactions where commercial certainty is paramount and where, as here, “the instrument was negotiated between sophisticated, counseled business people *326 negotiating at arm’s length” (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005]). In order to give effect to the reasonable expectations of the parties, “[a] contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases” (Consedine v Portville Cent. School Dist., 12 NY3d 286, 293 [2009]; see also Bailey v Fish & Neave, 8 NY3d 523, 528 [2007]). No portion of the contract should be rendered meaningless and, to the extent possible, interpretation should give effect to its general purpose (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-325 [2007]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]; Queens Best, LLC v Brazal S. Holdings, LLC, 35 AD3d 695 [2006]; First Fed. Sav. & Loan Assn. of Rochester v Minkoff, 176 AD2d 1049 [1991]). Extrinsic evidence may not be used to create an ambiguity in an agreement which is clear and unambiguous on its face. “Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing . . . Whether or not a writing is ambiguous is a question of law to be resolved by the courts” (WWW Assoc. v Giancontieri, 77 NY2d at 162).
In the 1921 agreement, Utica agreed to settle its numerous claims against the State of New York in return for the payment of $100,000 and a contractual commitment by the State to operate the Hinckley dam in compliance with the operating diagram “so far as practicable and consistent with the dominant use of the same for canal purposes” (claimant’s exhibit 3, 1921 agreement at 3). The essence of the agreement, for purposes of the instant motion, is the following:
“The intent and purpose of the agreement being so to operate the Hinckley State Reservior [sic] that, after serving the canal uses and purposes, of the State, it may so far as practicable, be fully used for the storage of water and the regulations of .the flow of West Canada Creek below the same for the benefit of the power property and riparian lands of [Utica] on West Canada Creek below the Hinckley State Reservior [sic]. Provided, however, that during periods of extraordinary or unusual drought, flood, or emergency caused by the temporary failure of other sources of water supply for the canal use, or the necessity to maintain, repair or reconstruct any part or portion of the Hinckley State Dam, the Superintendent of Public Works or other officer or *327 board succeeding to his powers and duties, without the payment of any damages to the party of the second part, upon such reasonable notice to the party of the second part, as the circumstances will permit may temporarily vary or entirely suspend the operation of the said dam and reservior [sic] as described and laid down in the operating diagram aforesaid during the periods of such extraordinary or unusual drought, flood or emergency caused by the temporary failure of other sources of supply for the canal use, or the necessity to maintain, repair or reconstruct any part or portion of the Hinckley State Dam” (exhibit 3, 1921 agreement at 3).
The defendant’s cross motion must be granted for two reasons. First, as repeated elsewhere in the agreement, the above provision obligates the State to use the waters regulated by the Hinckley Reservoir for the benefit of claimant’s predecessor in interest only “after serving the canal uses and purposes, of the State.” It is clear, and there is no argument here to the contrary, that ensuring an adequate supply of safe drinking water, especially during a period of drought, is a State “purpose” (see Matter of City of Syracuse v Gibbs, 283 NY 275, 283 [1940] [Statutory grant of authority to use of waters of Skaneateles Lake conveyed no exclusive dominion over the waters given by the state. “It was the duty of the State to control and conserve its water resources for the benefit of all the inhabitants of the State. The public right to the benefit of such resources is an incident of sovereignty”]; cf. Hydraulic Race Co. v Greene, 230 App Div 374 [1930], affd 257 NY 540 [1931] [lessee of surplus canal water was entitled to all of the surplus waters of the canal at Lockport subject only to reservation in lease for canal use]; see also ECL 15-0103 [1] [“The sovereign power to regulate and control the water resources of this state ever since its establishment has been and now is vested exclusively in the state of New York, except to the extent of any delegation of power to the United States”]; ECL 15-0105 [5] [“The acquisition, storage, diversion and use of water for domestic and municipal purposes shall have priority over all other purposes”]). As a result, the defendants may not be liable since its contractual duty to claimant is specifically made secondary to the use of the subject waters for canal uses and other state purposes, such as ensuring an adequate municipal water supply.
Second, and more importantly, the 1921 agreement specifically authorizes the defendant to vary or entirely suspend *328 releases otherwise required by the operating diagram “during periods of extraordinary or unusual drought.” Inasmuch as Erie does not dispute that an unusual drought was occurring at the time deviations from the operating diagram were made for the benefit of MVWA (see affidavit of Emmet M. Owens, Jr. sworn to Mar. 1, 2012; affirmation of Michael R. Fleischer dated Mar. 1, 2012), defendants are entitled to summary judgment dismissing the claim as a matter of law (see Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065 [1979]).
Claimant’s contention that no variance from the prescriptions of the operating diagram was necessary because the MVWA water supply was not, in fact, endangered, is beside the point. The defendants have established the existence of drought conditions between August 2007 and a major rainfall event on October 22, 2007 (affidavit of Emmet M. Owens Jr. sworn to Mar. 1, 2012) and the plain language of the parties’ contract explicitly authorizes the defendants to vary or curtail releases under such circumstances “without the payment of any damages to the party of the second part [Utica].”
Claimant’s counsel’s heavy reliance on defense counsel’s statement in the declaratory judgment action that the 1921 agreement contained no provision for deviating from the operating diagram for the benefit of MVWA is also misplaced. In the court’s view, this statement was nothing more than an acknowledgment that the rights of MVWA were not specifically addressed in the 1921 agreement.[5] This fact, however, has no bearing on the contractual right of the State to deviate from the operating diagram. It is true, of course, that MVWA is a stranger to the 1921 agreement. That fact is, however, irrelevant to the resolution of the present controversy. The plain language of the agreement could not be more clear in authorizing deviations from the operating diagram during times of extraordinary or unusual drought such as that reflected in the motion record.
This determination renders consideration of defendants’ laches defense unnecessary. Were the court to reach that issue, it would find it meritless (Gonzalez v Chalpin, 159 AD2d 553, 555 [1990], affd 77 NY2d 74 [1990]; Columbus Trust Co. v Cam- *329 polo, 110 AD2d 616, 618 [1985], affd 66 NY2d 701 [1985]; Makarchuk v Makarchuk, 59 AD3d 1094, 1095 [2009]; Blinds To Go [U.S.], Inc. v Times Plaza Dev., L.P., 45 AD3d 714, 715 [2007]; Hilgendorff v Hilgendorff, 241 AD2d 481, 481 [1997]).
Based on the foregoing, claimant’s motion for partial summary judgment on the issue of liability is denied, and the defendants’ cross motion for summary judgment dismissing the claim is granted.

. The named defendants are the State of New York, the New York State Canal Corporation and the New York State Thruway Authority. According to the Canal Hydrologist, Howard M. Goebel, the Hinckley Reservoir has been operated by the New York State Power Authority since 1983 and has continued to do so on behalf of the Canal Corporation since its creation in 1992 (affidavit of Howard M. Goebel 11 5).

. As reflected in this court’s prior decision and order dated July 22, 2010, the relationship between Erie and MVWA dates back to a 1905 agreement between their predecessors in interest in which Utica consented to the diversion of water from the West Canada Creek by MVWA’s predecessor, the Consolidated Water Company of Utica, New York (Consolidated), subject to the requirement that the flow must be sufficient for the operation of Utica’s power plant. The agreement was modified in 1919 to recognize Consolidated’s right to divert water from the creek above Utica’s power plant and to require Consolidated to contribute to the flow of water between the Hinckley dam and the (Utica) plant whenever the flow was less than 335 cubic feet per second. The additional waters to be used in supplementing water flow would come from “ ‘storage or compensating reservoir or reservoirs’ ” to be established pursuant to the agreement, as modified. Another agreement between these parties, entered into in 1925, continued the compensating flow requirements. However, in 1958 the parties released each other from all obligations arising from the prior agreements.

. The Appellate Division, Fourth Department held, among other things, that triable questions of fact existed regarding whether or not the State released MVWA from its obligation to provide a compensating reservoir upstream from the Hinckley Reservoir and, if not, whether the State should be barred by the equitable doctrines of estoppel, waiver and/or laches from enforcing the flow compensation and reservoir provisions of the 1917 agreement (id.).

. The 1921 agreement in issue also contained a requirement that the State allow water released from Erie’s compensating reservoir located upstream from the Hinckley Reservoir to pass through the Hinckley dam upon the request of Erie or upon the request of the State during certain times of the year. None of the parties have asserted a breach of this portion of the agreement.

. Paragraph “SEVENTH” of the 1921 agreement states: “[n]othing herein contained shall be construed to change alter or modify in any respect the provisions of the contract between the Consolidated Water Company of Utica, New York, and the party of the second part, dated March 10th 1905 or any amendments there of or any contract substituted therefor.”