In the Matter of TON-DA-LAY, LTD., Petitioner, and FRANKLIN COUNTY et al., Intervenors-Petitioners, v. HENRY L. DIAMOND, as Commissioner of Environmental Conservation, et al., Respondents, and SIERRA CLUB, Intervenor-Respondent.

Third Department May 16, 1974.

*Kronish, Lieb, Shainswit, Weiner & Hellman (David N. Ellenhorn* and *Peter J. Mansbach* of counsel), for petitioner.

*Louise Mills, County Attorney,* and *Adam Palmer, Town Attorney (Charles S. Desmond* of counsel), for intervenors-petitioners.

*Louis J. Lefkowitz, Attorney-General (Julius Feinstein, Ruth Kessler Toch* and *Stanley Fishman* of counsel), for Henry L. Diamond and another, respondents.

*Kafin & Needleman (Neil E. Needleman* of counsel), for intervenor-respondent.

KANE, J.  This is a proceeding pursuant to article 78 of the CPLR (transferred to the Appellate Division of the Supreme Court in the Third Judicial Department by order of the Supreme Court at Special Term, entered in Essex County) to review a determination of the Commissioner of Environmental Conservation which rejected petitioner's applications for the approval of planned water supply and sewer treatment systems to serve a projected second home Adirondack community.

Petitioner, Ton-Da-Lay, Ltd., is the owner of an unimproved tract of land exceeding 18,000 acres in Franklin County. Located in the heart of the Adirondacks, petitioner proposes to develop this property in phases as a second home vacation community with attendant recreational, resort, commercial and service enterprises. It would begin by opening a 1,245-acre portion of this property surrounding a 70-acre body of water known as Dry Channel Pond. Designated as its "Stage I", about 750 acres of this parcel would be subdivided into some 300 lots and sold or retained by Ton-Da-Lay for several uses including single and multiple dwellings, a camper area, motel-restaurant facilities, an information center and general store. For the most part, petitioner would permit improvement construction to be undertaken by the new lot owners under a complex scheme of controls. Before marketing this property, however, petitioner plans to supply the proposed subdivision sites with suitable access, water, sewage and power capabilities.

With these objectives in mind, formal application was made to the Department of Environmental Conservation, the respondent herein, seeking approval to acquire, install and operate a limited potable water supply system for this Stage I property,

and an additional application was filed with the Health Department pursuant to section 1120 of the Public Health Law for approval of a proposed sewage disposal system. In the course of the ensuing public hearing conducted by the Department of Environmental Conservation, Ton-Da-Lay also sought realty subdivision approval and a variance from certain community sewage system requirements. All of its requests were denied and this article 78 proceeding ensued.

The State clearly possesses the duty and power to conserve and control water resources for the benefit of its inhabitants (see *Matter of City of Syracuse v. Gibbs*, 283 N. Y. 275). Major responsibility for performing the duties and exercising the powers associated therewith have been legislatively delegated to respondent (see Environmental Conservation Law [hereafter ECL], §§ 15–0103, 15–0105, 15–0109). In particular, those provisions of law concerning proposed water supply systems which affect the outcome of this proceeding are contained in title 15 of article 15 of the Environmental Conservation Law (as amplified by regulations contained in 6 NYCRR Part 601). Broadly speaking, those who propose to acquire, develop, use or distribute potable water for domestic purposes must obtain approval of the department before commencing any work toward that end and then secure final approval before operating a project so authorized upon its completion (ECL, §§ 15–1501, 15–1503, 15–1529). Plans and maps must be submitted in application form to satisfy the department, after a hearing, that the proposal is (1) justified by public necessity; (2) provides for the proper and safe construction of associated work; (3) provides for the proper protection of the supply and watershed from contamination or provides for adequate treatment of such additional supply; (4) is just and equitable to other municipalities and their inhabitants; and (5) makes fair and equitable provision for the determination and payment of direct and indirect damages to persons and property resulting from execution of the project (ECL, § 15–1503, subd. 4). Obviously, these statutory considerations are not mutually exclusive and contain some overlapping features.

Adopting most of the findings of its hearing officer, respondent found petitioner's application and proof insufficient to permit a favorable determination to be made on four of the aforementioned standards and denied the same without prejudice to a subsequent application. The department concluded, however, that Ton-Da-Lay's proposed water supply system would have no adverse effect on the present or future water supply

interest of any municipality or their inhabitants. Petitioner assails this result contending it also satisfactorily met each of the remaining considerations.

Since they were based on substantial evidence, we are constrained to uphold the department's determinations that petitioner's plans made insufficient provision for proper and safe construction and for protection of the supply and watershed from contamination.

The plans did not contain a watershed map (6 NYCRR 601.11), contract or structural specifications (6 NYCRR 601.17, 601.13), vertical profile scales of the elevations and depressions of principal pipes (6 NYCRR 601.12), or a bacteriological analysis of the proposed supply (6 NYCRR 601.18). Respondent's statutory obligation to "make a reasonable effort to meet the needs of the applicant" (ECL, § 15–1503, subd. 5) should have induced the department to point such deficiencies out to petitioner, allowing it an opportunity to cure their absence if possible. Although the failure to provide any one of these required items may seem of lesser significance, the cumulative effect of their absence lends support to the commissioner's conclusion.

The same may be said of the inadequacy of the plans to properly provide for the protection of the supply and watershed. The proposal called for a well to pump available ground water to a supply reservoir which would then feed petitioner's distribution pipes. Although the well site appears to have been adequately guarded from contamination, the same cannot be said of the supply itself. The record demonstrates that gradient difficulties with petitioner's proposed road network might necessitate its relocation from the manner in which it was diagrammed in the application. This takes on significance because water distribution pipes, as constructed, would be underneath this road. Consequently, any change in road plans would change the layout of the distribution system. This might not only alter the propriety and safety of the waterworks construction, but also expose the system to unexplored possibilities of supply contamination.

As discussed later, petitioner would utilize individual septic systems as the sewage disposal method for its Stage I development. The ability of the soil to accept such effluent could obviously affect the quality of the ground water supply. Therefore, we cannot say that the department was without evidence to find that the absence of appropriate geological and soil testing prevented it from determining whether contamination of the water supply could occur under such circumstances.

It should be noted that the parties have disputed the ability of the proposed well to generate an adequate quantity of water to supply the needs of Stage I. However related to this proceeding, that issue is not presently before us, since such a determination was not required to be made until after the department rejected the instant application (see ECL, § 15–1503, subd. 4), as amd. by L. 1973, ch. 157, § 2, eff. Sept. 1, 1973). Upon reapplication, additional pumping tests may put this dispute to rest.

Our acceptance of the department's conclusions concerning the sufficiency of the plans for proper construction and for the protection of the water supply does not carry over to its resolution of the public necessity issue and the ability of Ton-Da-Lay to meet damages arising from construction of its proposed waterworks.

Respondent relied exclusively on the absence of an " environmental impact assessment " (see 6 NYCRR Part 615) to refuse determination of whether the water supply application was justified by public necessity. Petitioner's asserted failure in this regard did not inhibit the further finding that its plans " including its Stage I plans, would adversely affect the health, safety and welfare of the people of the State and the natural resources thereof and unnecessarily degrade and result in other undesirable or unintended consequences to the · * * * Stage I area, its entire 18,386 acre tract and the region in which they are located." We cannot permit such an extensive and unqualified finding to stand as a true measurement of the " public necessity " aspect of this proceeding.

While it is conceivable that some water resource matters could affect all inhabitants of this State to the same extent, we believe that the " public necessity " consideration contained in subdivision 4 of section 15–1503 of the Environmental Conservation Law was meant to afford some measurement of the public's need *for the particular water supply proposed.* While not supplying a precise definition, judicial interpretation of similar language found in this statute's predecessor clearly supports this view (see, e.g., *Matter of Sperry Rand Corp.* v. *Water Resources Comm.,* 30 A D 2d 276, mot. for lv. to app. den. 24 N Y 2d 737; *Matter of Great Neck Water Auth.* v. *Water Resources Comm. of Dept. of Conservation of State of N. Y.,* 22 A D 2d 78; *Matter of Spring Val. Water Works & Supply Co.* v. *Wilm,* 14 A D 2d 658). Although this term may well encompass more than the conflicting water supply interests among competing private, corporate or municipal bodies, no

authority even remotely suggests that an evaluation of " public necessity " mandates a minute examination into the needs of the people of the State as a whole before any geographically limited proposal for the use of potable water could ever become justified. If petitioner is successful in attracting residents to its development, they will obviously need a suitable supply of potable water. Unless some valid reason to conserve the supply otherwise available for that purpose could be articulated, we fail to perceive any rational basis upon which the instant proposal lacks a sufficient showing of " public necessity ", particularly when petitioner is not seeking to obtain its supply from sources outside its own land and respondent has already determined that other municipalities would not be affected by its use of the proposed supply.

In addition, petitioner did submit a paper entitled an "Environmental Impact Report " as part of its application. Respondent quarrels with its contents, asserting it was merely a before the fact compilation of Ton-Da-Lay's resources and not the detailed environmental assessment of effects to be caused by the proposal as supposedly required.

Although the environmental effect of acquiring a new water supply might properly be considered by the department as a factor in determining whether " public necessity " justified the proposed works, the absence of any definition concerning the items of environmental impact to be considered or, more importantly, how those elements should be weighed, severely circumscribes the department's authority to conclude that an insufficient assessment would, *of itself,* preclude any determination justifying such projects. 6 NYCRR Part 615 does not reach the required definitive standards necessary to inform an applicant of exactly what is required for compliance. While those regulations seemingly require an " environmental impact assessment " whenever a permit of this nature is applied for (6 NYCRR 615.2[b]), the commissioner may waive such a report (6 NYCRR 615.3[d]). He may likewise establish guidelines for the content of such assessments in his unfettered discretion (6 NYCRR 615.3[a]). Finally, he may measure for himself which proposals would cause irreparable and irretrievable damage to the environment and natural resources of the State (6 NYCRR 615.4[a]).

Respondent also found petitioner's application and proof insufficient to make any determination that it would be able to meet potential damages arising from the execution of its plans. The only findings of fact germane to this issue related

to the projected costs of Stage I and Ton-Da-Lay's fiscal ability to meet such obligations. From them the department could well conclude that petitioner was not then in a financial posture capable of meeting current expenses for its share of proposed Stage I improvements. In short, Ton-Da-Lay appeared to be over extended. Although some evidence of the cost of constructing the waterworks was adduced, no effort was made to measure the potential amount of legal damages to others arising therefrom or evaluate whether petitioner could meet such a responsibility by postponing other expenditures and diverting capital to this purpose. It would seem that the requirement for an applicant to submit just and equitable plans for the payment of legal damages was likely meant to afford some protection to landowners affected by construction of water-work facilities through their property. Even if this view is too restrictive, it still does not appear that by developing the proposed waterworks system wholly within its own property, petitioner could possibly damage anyone other than the firms it engages to perform such work. We find nothing in the Environmental Conservation Law which would enable the department to properly concern itself with the financial well-being of such parties. Petitioner's plans cannot be said to be insufficient in this regard when no attempt whatever was made to assess the potential liabilities Ton-Da-Lay would be forced to accept should its plans be approved. If injury to sub-division owners was feared, the department could easily have conditioned its authorization for construction of the water supply proposal upon satisfactory completion and final approval before sale of the parcels serviced thereby could begin (ECL, § 15.1503, subd. 5).

As previously noted, petitioner filed an application for approval of a proposed sewage disposal method consisting of individual septic systems with the Health Department. Pursuant to statutory authority, the hearing conducted herein was expanded to include an investigation of the propriety of this application by the Department of Environmental Conservation (ECL, § 17–1509). In order to obtain approval for a project of the size contemplated by petitioner, a community sewage system is required (ECL, § 17–1515; 6 NYCRR 653.4), unless a variance is granted by the commissioner in a proper case (6 NYCRR 653.6). There is an abundance of evidence to support the conclusion that a community sewage system would not be feasible at petitioner's location. Several valid reasons for such a determination find support in the record from the

testimony of recognized experts. Consequently, individual septic systems must be considered the most appropriate alternative. Yet the commissioner determined that "Applicant's plans for individual septic tanks are not in harmony with the general purpose and intent of the Department's regulations for approval of realty subdivisions (6 NYCRR Part 653)." This blanket conclusion is supported only by a finding that " The application and record do not reveal sufficiently extensive geological testing, deep borings and phosphorus absorption testing to establish the capacity of the soil adequately to receive and filtrate sewage, or evidence with respect to alternative community sewage treatment systems ". Despite this apparent impasse, we are compelled to conclude that there is substantial evidence in the form of expert testimony to support the finding that existing plans for individual septic systems could add phosphorus pollution to the lakes in the area. We cannot say it is an abuse of discretion for the commissioner to require more convincing evidence that the septic tank system now offered will provide the proper degree of protection and, lacking such proof, deny a variance at this time. We hasten to add, however, that upon reapplication, acceptable procedures could be culled from the massive amount of expert testimony in this record, sufficient to equip petitioner for the pursuit of its objective. Not to be overlooked is the fact that petitioner has agreed to perform additional soil tests before permitting installation of such a septic system on any particular lot.

Finally, we are called upon to determine whether the commissioner possesses the statutory power to reject petitioner's applications and plans for water and sewage on the grounds of the aesthetic and ecological undesirability of the entire project. Obviously, he possesses the same powers with respect to a sewage system application that he does for a water system application, and what we hold with respect to one, applies with equal force to the other. This is so because the issue of " damage to the environment " must be relegated to its proper place of importance within the statutory framework peculiar to the particular application under review. Unless there are clearly defined boundaries within which such environmental determinations can be made, there is always the danger that the ultimate decision will be subjective in nature.

We are unable to unravel the purely environmental determinations of respondent in this matter, enmeshed as they are in several findings, to discern how far they permissibly influenced resolution of the instant applications. However, we can say

that conclusions on how Ton-Da-Lay's over-all Stage I and entire property development might adversely affect its property and the region in which it is located as a whole were neither necessary nor appropriate to these limited applications. It should not be overlooked that other agencies and local authorities share the concern and competence of respondent to assure environmentally sound development. While it is true that the commissioner is vested with broad powers, he is circumscribed in exercising such powers by established principles of administrative law.

Accordingly, those portions of the determination under review which (1) find a lack of public necessity; (2) find a failure to provide for payment of damages; and (3) find an undesirable environmental impact on the entire region in a broad and unspecified manner, should be annulled for the reasons stated herein.

The determination should be modified by striking therefrom items 1, 4 and 5, and, except as so modified, confirmed, without costs.

STALEY, JR., J. P., GREENBLOTT, COOKE and REYNOLDS, JJ., concur.

Determination modified by striking therefrom items 1, 4 and 5, and, except as so modified, confirmed, without costs.